[No. 44800. En Banc. November 2, 1978.]

FRANK M. JEWELL, ET AL, *Appellants*, v. WASHINGTON
UTILITIES AND TRANSPORTATION COMMISSION,
ET AL, *Respondents*.

*John D. Blankinship* (of *Montgomery, Purdue, Blankinship & Austin*), for appellants.

*Slade Gorton, Attorney General,* and *James R. Cunningham* and *Ellis Ross Anderson, Assistants,* for respondent State.

*C. Lee Coulter* (*John Robert Jones,* of counsel), for respondent General Telephone.

*Thomas R. Beierle,* for respondent Pacific Northwest Bell.

BRACHTENBACH, J.—Should charitable contributions by privately owned telephone companies be paid by the telephone users or by the companies' stockholders? That is the issue in this case.

In two telephone rate setting cases, the Utilities and Transportation Commission (commission) allowed charitable contributions to be included as part of the expenses of doing business in establishing telephone rates pursuant to RCW 80.01.040(3). This allowance was a change in policy by the commission which had previously denied contributions as an expense to be taken into account in determining rates.

Appellants are subscribers and therefore ratepayers of General Telephone Company. They sought review of the rate setting order of the commission. Pacific Northwest Bell (PNB) intervened. The trial court upheld the commission's action. We reverse.

Telephone companies and certain other utilities occupy unique status under state law. They are granted a monopoly. Telephone companies are awarded the ultimate sovereign power of eminent domain. RCW 80.36.010. In return they are regulated extensively by the commission, including most importantly the rate structure which they may charge their customers. RCW 80.36.080.

The commission is directed to "[r]egulate in the public interest . . . the rates . . . of all persons . . . supplying any utility service . . . including . . . telephone companies . . ." RCW 80.01.040. The commission is to set rates which are fair, just, reasonable and sufficient to allow the telephone company to render prompt, expeditious and efficient service. RCW 80.36.080.

We recognize the commission's broad generalized powers in rate setting matters. We are not at liberty to substitute our judgment for that of the commission. Our review of the actions of the commission is limited to those

promulgated in the administrative procedures act, specifically RCW 34.04.130. However, the commission must act within its statutory authority, RCW 34.04.130(6)(b), and its acts cannot be arbitrary or capricious, RCW 34.04.130(6)(f). We conclude that its orders in these cases were beyond its statutory authority and arbitrary and capricious upon the record before it.

While the statutory direction to the commission in rate setting is broadly stated and while rate cases are complicated, the legislative intent is rather simple. The public interest, in return for the grant of a monopoly, requires prompt, expeditious and efficient service. Quid pro quo, the company is entitled to rates which are fair, just, reasonable and sufficient to allow it to render such services. RCW 80.36.080.

There is nothing in the statutory scheme which directs that the telephone company must be a good corporate neighbor or that it is entitled to rate charges for contributions which result in improving the image of the corporation. Yet that is the essence of the testimony before the commission. There is a total lack of any proof or finding that the telephone users are receiving any more "prompt, expeditious and efficient" telephone service because the telephone companies choose to contribute to, among other charities, hospitals or private colleges.

The commission's orders demonstrate how far it has strayed from its statutory function. Those orders state, in part, that charitable contributions are "socially appropriate, indeed mandatory Company expenses." Further, "all businesses in the state of Washington are expected to, and in fact do, support social and charitable institutions through contributions." The commission is not the keeper of the social conscience of the citizens of this state. The arbitrary and capricious nature of its orders is simply proved by its conclusions that (1) it is socially appropriate, indeed mandatory, that the contributions be made and that (2) all businesses are expected to, and in fact do, make charitable contributions. The commission may be accurate in its

statements, but that does not mean it has statutory authority to order telephone users to make involuntary contributions.

The commission's orders beg the essential question. Those orders are premised upon the idea that utility contributions are expected and desirable. We agree. The question is who pays for them. They can be paid for by the investors who own the utility and are interested in its corporate image and its community responsibilities, or they can be paid for by the unwitting telephone subscribers who just want to be able to use their telephones.

The attitude of PNB in its brief before the commission indicates that it hardly considers itself a public service company. It stated:

> The amount and burden on the ratepayer which would result from the recognition of charitable contributions by the Commission as a legitimate rate making expense is so minuscule as not to be measurable. However, the underlying principle is *extremely* important.
>
> It is respectfully submitted that more harm has been done to deserving charities and those whom they seek to help with the thoughtless repetition of that old shibboleth: "charitable contributions are an involuntary levy on the ratepayer" than the mind of man can conceive.
>
> That slogan is the product of an era of unenlightened irresponsibility on the part of all segments of society. It is an embarrassment. It should not be dignified by repetition. It is contrary to the oft–repeated concerns of this Commission for the poor and the less fortunate. It is completely demoralizing to the regulated utility which recognizes and assumes its share of social responsibility. It is a phrase that is mean and penurious.
>
> . . .
>
> It is suggested that the impact of charitable contributions on the enlightened ratepayer would be the least objectionable on the scale of increased costs because of the nature of the needs to which those contributions respond.

Suffice it to say that the state of Washington in granting PNB a monopoly, has not delegated to it the decision as to who is an "enlightened" ratepayer or the right to decide

that any portion of the telephone bill is so minuscule as to be not measurable. If it is so minuscule as to be not measurable, surely the stockholders will find it minuscule, not measurable and therefore not objectionable.

Next, the position of the telephone companies overlooks the fact that the legislature has addressed the charitable responsibility of telephone companies. In RCW 80.36.130, the companies are authorized to render free or reduced cost services to certain identified charities.

Equally unimpressive is the argument that because the legislature has authorized corporate contributions, RCW 23A.08.020(13), it impliedly approved these contributions. No one attacks the legality of the contributions and the issue is irrelevant.

The dangers inherent in the commission's action are apparent from the contents of its orders. It cautions the utilities that the contributions must be distributed free of political interests or pressure. It warns the utilities that they should not withhold contributions from charities, such as a legal services organization, with interests adverse to the utility. The order states: "The utility is warned that should a situation of this nature occur, the utility's total charitable contribution budget for the year in question may be disallowed." We have no doubt that the legislature did not authorize the commission to determine what is political interest or pressure inherent in a contribution or what organizations have a potential interest adverse to the utility.

Because our decision is based upon interpretation of the statutes, we do not reach the constitutional issues raised. However, it is apparent that the kinds of decisions and pressures inherent in the limitations of the order would put the appointed commissioners into an entanglement of politics, private schools, religious issues and social policies beyond anything authorized by the legislature and into a constitutional thicket of substantial question.

This issue of whether charitable contributions are to be charged to the users or the shareholders is not new. There

is a clear division of authorities, both from the courts and the regulating commissions throughout the country. Most of the cases and decisions are merely conclusionary. Those denying allowance refer to the involuntary levy upon the ratepayer. Most of those allowing the contributions rely upon the desirability of the charitable acts. The companies allege that the trend of decisions is toward allowance. Yet our research discloses recent cases and orders denying allowance. For example, in *Pacific Tel. & Tel. Co. v. Public Util. Comm'n,* 62 Cal. 2d 634, 668, 401 P.2d 353, 44 Cal. Rptr. 1 (1965), it is stated:

> However, Pacific's present attempt to charge all of its own contributions as an operating expense to be borne by ratepayers is plainly unwarranted. ". . . [Pacific] should not be permitted to be generous with ratepayers' money but may use its own funds in any lawful manner."

Likewise in *Southern New England Tel. Co. v. Public Util. Comm'n,* 29 Conn. Supp. 253, 274, 282 A.2d 915 (1970), it was said:

> Charitable contributions are not universally regarded as a deductible expense for rate making purposes. There is a considerable divergence of opinion on this point. Most regard such contributions as an involuntary levy on ratepayers, who, because of the monopolistic nature of utility service, are unable to obtain service from another source and thereby avoid such a levy. Others consider charitable contributions a matter of personal choice and that they should not be hidden in a customer's bill, especially when their beneficial effect may be far removed from his community.

*Contra, New England Tel. & Tel. Co. v. Department of Pub. Util.,* 360 Mass. 443, 484, 275 N.E.2d 493 (1971). See also the cases cited in *Davenport Water Co. v. Iowa State Commerce Comm'n,* 190 N.W.2d 583, 607 (Iowa 1971). Commission rulings disallowing charitable contributions include *Re Mountain States Tel. & Tel. Co.,* 78 PUR3d 429, 440 (Utah 1969); *Re Wisconsin Tel. Co.,* 84 PUR3d 50, 53 (Wis. 1970); *Re Mountain States Tel. & Tel. Co.,* 94 PUR3d 263, 288 (Ariz. 1972); *Re Mountain States Tel. &*

*Tel. Co.,* 96 PUR3d 321, 326 (Colo. 1972); *Re Southern Union Gas Co.,* 12 PUR 4th 219, 228 (N.M. 1975); *Bainbridge Motor Co. v. General Tel. Co.,* 12 PUR 4th 416, 423 (Pa. 1975); *Re Hawaii Elec. Light Co.,* 13 PUR 4th 329, 333 (Hawaii 1976). *See also Re Pacific Northwest Bell Tel. Co.,* 100 PUR3d 82, 90 (Ore. 1973), which states:

That which is involuntarily removed from the telephone subscribers' pockets is more akin to a tax than a charitable contribution. Pacific Northwest Bell Telephone Company is a monopoly and the subscribers cannot go elsewhere for service.

The order of the trial court is reversed.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, HOROWITZ, and HICKS, JJ., concur.

DOLLIVER, J. (dissenting)—The majority correctly states the issue before the court is whether charitable contributions by the telephone company be included by the Washington Utilities and Transportation Commission as part of the rate base in determining the proper rate of return. However, it discusses the wrong question. The question is not who pays for the contributions. That has been determined already by the legislature and should be outside the province of the court. The question rather is whether the commission, in allowing charitable contributions to be part of the rate base, followed the requirements of RCW 80.36.080 that the rates be "fair, just, reasonable and sufficient".

RCW 23A.08.020(13) provides:

Each corporation shall have power:

. . .

(13) To make donations for the public welfare or for charitable, scientific or educational purposes; and in time of war to make donations in aid of war activities.

In other words, the legislature has specifically recognized charitable contributions as a legitimate and allowable expense of doing business.

The majority brushes aside the relevance of this statute: "No one attacks the legality of the contributions and the issue is irrelevant." But attack the legality of the contribution is precisely what the majority does. It looks to the public service statutes and asserts the Washington Utilities and Transportation Commission has no authority to include charitable contributions in the rate structure and, thus, the sort of corporate contribution allowed to be made by every other corporation in the state is here declared illegal. Although the majority makes the obvious point that the position of a regulated corporate monopoly is different from other private corporations, it nowhere indicates where the legislature has expressed an intention that RCW 23A.08.020(13) does not apply to telephone companies or other corporations regulated by the commission.

The majority's argument seems to have two points: (1) The contributions would be "involuntary" and thus beyond the authority of the commission; and (2) there is no relationship between "prompt, expeditious and efficient" telephone services and the charitable contributions of the telephone companies.

At the root of the majority opinion is a misapprehension as to the true function of the commission toward a regulated and, in this case, a monopoly corporation. The majority claims that to include corporate contributions in the calculation of the rate base would force an involuntary contribution to charity on the part of the ratepayer. Of course it would. But this misses the point. *Any* charitable contribution on the part of a telephone company or any other corporation, whether charged as a cost of doing business or against profits, is an involuntary contribution on the part of those who purchase the goods and services of the corporation. It is from its customers that income for a corporation is derived. It is from income that charitable contributions and other costs are paid. Thus, the argument as to the voluntary/involuntary nature of the contribution is irrelevant.

What are the mechanisms used to keep the amount of charitable contributions within reasonable bounds? In a free market economy, this is done by competition. A business whose costs become disproportionate because of excessive charitable giving will soon find its prices also to be disproportionate and its customers patronizing its competitor. Similarly, if a corporation gives to unpopular charitable causes, its customers may go elsewhere. Thus, the actions of the market which also include price as well as public attitudes and regulations as to the kind and degree of charitable contributions, serve as a regulating mechanism to protect the customer.

How is the customer/ratepayer of a regulated monopoly protected? By the competitive surrogate of the commission which is required to set rates—*i.e.,* prices—which are "fair, just, reasonable and sufficient". RCW 80.36.080. Rates are regulated by the commission. RCW 80.01.040. Upon the filing of rate changes by the public service company, public hearings are held at which testimony is received and all parties are entitled to be heard. Following the hearings, the commission enters an order. and fixes the rates for the services provided. At all times, the public service companies are subject to the strict and continuing authority of the Washington Utilities and Transportation Commission. *See generally* RCW 80.04.

It should not go unnoticed that plaintiffs in this case did not avail themselves of their opportunity to play a role in setting the rates they pay for telephone service by participating in the hearings before the commission. *See* WAC 480–08–040(4); 480–08–070.

Since the reasonableness of the rate/price structure for a regulated monopoly or the character of its charitable contributions cannot be set by a competitive market, it is done by the commission acting as the representative of the public and as a surrogate for competition. *See The Protection of Public Utility Consumers,* 28 Baylor L. Rev. 1061 (1976).

In summary, it should be emphasized (1) that public policy in this state specifically allows corporate charitable

contributions; (2) regardless of the nature of the corporation, the "contribution" of the customer to the corporate charity is involuntary; and (3) the fundamental question is not whether, but how much.

Has the commission taken proper steps to assure that the rate structures, which include these charitable contributions, are "fair, just, reasonable and sufficient"? RCW 80.36.080. Not surprisingly, neither the appellants nor the majority questions this. As the commission stated in this case, "Neither the propriety of nor the amount of the expenditure is questioned by any party to this proceeding."

The record is replete with testimony as to the reasonableness of the contributions. Two examples are illustrative: General Telephone testified only 15/10,000 of its annual revenue goes to charity. Pacific Northwest Bell testified that in 1972 manufacturing, banking and utilities generally gave .83 percent, 1.07 percent and .44 percent respectively to charitable and educational organizations. Pacific Northwest Bell gave .31 percent.

In addition, the Washington Utilities and Transportation Commission has devised elaborate monitoring devices to assure the amount and character of the charitable contributions are appropriate. The ratepaying public is fully protected.

At one point in its opinion, the majority asserts the commission is not "the keeper of the social conscience of the citizens of this state". After reading the opinion, the reason soon becomes apparent: The majority chooses to reserve this role for itself. But the social conscience of the public is not the business of either the commission or the court. It finds its expression in the citizenry and its warrant through the legislature which represents the citizens.

The Washington Utilities and Transportation Commission is called upon to protect the ratepayers from unreasonable contributions both as to amount and kind. This it has done, and its actions in this regard are not contested. The commission and the utilities have acted within the statutes. While the majority tantalizes with words such as

"entanglement" and "constitutional thicket", it declines to reach constitutional questions. I believe it does so with good reason since I believe none exist.

It may be granted that mechanisms to assure fair prices as well as quality products and services to consumers are faulty at best. Just as the market may malfunction, so may the Washington Utilities and Transportation Commission fail to perform as well here as it might in the test tube of an ideal world. Yet, it is the method the people of this state, through their elected representatives, have chosen and it is one which the people, directly or through their representatives, have the prerogative and the power to change.

As to its second argument, the majority has reduced the entire relationship of ratepayer/utility to the cash nexus of the rate paid and the "direct benefits" received. It claims ratepayers do not benefit through the charitable contribution of the utility. This is, I believe, far too narrow a view of both benefit and social policy.

Simply because it belittles a social conscience, the majority cannot will away those needs which charitable and educational organizations fulfill. The needs of society will be met. The existence of strong, voluntary charitable and educational institutions is a direct benefit to citizens and ratepayers alike. The loss of these institutions would be a detriment which would fall on both citizen and ratepayer. To assure the continued existence of voluntary organizations, I believe it is within the statutory mandate of the Washington Utilities and Transportation Commission to allow the telephone companies to support voluntary charitable and educational institutions so as to help them meet public needs. The alternative to strong voluntary organizations is to have all charitable and educational institutions run by the state and let the taxpayers—which includes the ratepayers—foot the entire bill. This would truly be an "involuntary contribution".

It should also be noted in passing that the majority position claims too much. From its analysis, it is difficult to see where the telephone company could "make donations in aid of war activities" or do any number of things an ordinary corporation is allowed to do under RCW 23A.08.020.

The vitality of and the benefits from the voluntary sector in American life have been recognized consistently. This sector is one of those things which has differentiated the American experiment from other countries:

> Americans of all ages, all stations in life, and all types of disposition are forever forming associations. There are not only commercial and industrial associations in which all take part, but others of a thousand different types—religious, moral, serious, futile, very general and very limited, immensely large and very minute. Americans combine to give fetes, found seminaries, build churches, distribute books, and send missionaries to the antipodes. Hospitals, prisons, and schools take shape in that way. Finally, if they want to proclaim a truth or propagate some feeling by the encouragement of a great example, they form an association. In every case, at the head of any new undertaking, where in France you would find the government or in England some territorial magnate, in the United States you are sure to find an association.

2 A. de Tocqueville, *Democracy in America,* "On the Use Which The Americans Make of Associations in Civil Life," ch. 5, at 15 (Anchor ed. George Lawrence transl. 1969). *See Giving in America,* "Toward a Stronger Voluntary Sector," Report of the Commission on Private Philanthropy and Public Needs (1975); N.Y. Times, July 2, 1978, at 1, col. 5, article entitled "Private Charity Going Out of Style in West Europe's Welfare States"; *Pacific Tel. & Tel. Co. v. Public Util. Comm'n,* 62 Cal. 2d 634, 677, 401 P.2d 353, 44 Cal. Rptr. 1, 28 (1965) (Peters, J., concurring and dissenting).

If the people wish to abandon voluntarism and the ability of corporations to contribute to private charity, they

will, after public debate, do so. It should not be done by this court.

UTTER, J., concurs with DOLLIVER, J.