[No. 16170-2-II.   Division Two.   August 10, 1994.]

WASHINGTON INDEPENDENT TELEPHONE ASSOCIATION, *Appellant,* v. TELECOMMUNICATIONS RATEPAYERS ASSOCIATION FOR COST-BASED AND EQUITABLE RATES, ET AL, *Respondents.*

*Richard A. Finnigan* and *Vandeberg & Johnson,* for appellant.

*Christine O. Gregoire, Attorney General,* and *Steven W. Smith, Assistant,* for State.

*Arthur A. Butler, Stephen Kennedy,* and *Ater, Wynne, Hewitt, Dobson & Skeritt,* for respondent TRACER.
*Edward T. Shaw,* for respondent U S WEST.

[As amended by order of the Court of Appeals September 7, 1994.]

ALEXANDER, J. — The Washington Independent Telephone Association (WITA) appeals an order of the Thurston County Superior Court, in which that court declared invalid a rule promulgated by the Washington Utilities and Transportation Commission (Commission) creating the Community Calling Fund (CCF), WAC 480-120-425. WITA contends that the trial court erred in determining that the Commission was without statutory authority to adopt the rule. We affirm.

This case concerns the complex subject of telecommunications regulation. Before discussing the issues in this appeal, it is worthwhile to briefly examine some of the basic concepts involved in the rapidly changing field of telecommunications service as we glean them from the record that has been presented to us.

Following the breakup of the American Telephone and Telegraph Company (AT&T), *United States v. AT&T,* 552 F. Supp. 131 (D.D.C. 1982), *aff'd,* 460 U.S. 1001, 75 L. Ed. 2d 472, 103 S. Ct. 1240 (1983), a modified structure for telephone service in Washington State was established. The basic unit of this structure is the exchange.[1] An exchange, as determined by the Commission, is "a unit established by a utility for communication service in a specific geographic area, which unit usually embraces a city, town or community and its environs." There are approximately 300 exchanges in Washington State.

Each exchange is served by a local exchange company (LEC), which provides a range elecommunications ser-

---

[1] The exchange dates back to the early development of telephone service when it constituted the area served by a "single central office where the operator-attended switchboard was housed." Although today the switchboard is computerized, the exchange remains the basic and smallest unit of telephone service.

vice within each exchange. Such service includes "access service"; which enables a local customer to connect with other exchanges.[2] It also includes local calls, *i.e.*, calls that originate and terminate within the same exchange. A local call is charged on a flat rate basis and is billed to a customer on the "monthly bill".

Interexchange companies provide service between exchanges. Some interexchange companies, such as AT&T, MCI Telecommunications Corporation, and US Sprint provide service between various Local Access and Transport Areas (LATA's), which are larger geographic areas consisting of many exchanges, roughly coinciding with area codes.[3] These interexchange companies may also compete in providing *intra*LATA, interexchange service. Other companies provide only intraLATA service. For instance, U S WEST Communications, Inc. (U S WEST), a former Bell Operating Company which is also an LEC, is authorized by the Commission to provide interexchange, intraLATA service in most of Western Washington.

When a telephone call is placed between two different exchanges (an interexchange call), regardless of whether it is intraLATA or interLATA, it is generally considered a "toll" call, for which the customer originating the call is charged a fee based on usage. When a "toll" call is placed between exchanges, the interexchange company that carries the call (regardless of whether the call is interLATA or intraLATA) must use the access services of LEC's. In return for the use of an LEC's access services, the interexchange company compensates the LEC (both the originating and terminating end if the LEC's are different) with access charges.[4]

---

[2]The Washington Supreme Court recently held that the Commission is not authorized by statute to grant one LEC the exclusive rights to provide all telecommunications service within a given exchange. *In re Consolidated Cases*, 123 Wn.2d 530, 537-42, 869 P.2d 1045 (1994).

[3]Washington has four LATA's, of which the largest ones are centered in Seattle and Spokane.

[4]Each LEC operating in Washington State has access tariffs on file.

This system enables smaller LEC's to raise sufficient operating revenue; even though the amount of "local service revenues" from local customers may have been small, LEC's could realize sufficient revenue from access charges they obtained from interexchange companies resulting from "toll" calls. Although this system adequately compensated LEC's, it placed an onerous financial burden on some telephone users who made frequent "toll" calls.

In 1989, the Legislature, in an effort to enhance telephone service, enacted legislation which established a pilot program to encourage the growth of Extended Area Service (EAS).[5] RCW 80.36.855. EAS involves the conversion of some frequently used interexchange "toll" routes to interexchange extended area "local" calling. Essentially, EAS redefined the local calling area by giving callers the ability to place a telephone call from one exchange to another without incurring a toll charge. RCW 80.36.850. Under the pilot program, a business, resident or community could petition for EAS within the service territory of the local exchange company that provides service to the petitioner. RCW 80.36.855. The EAS pilot program expired on December 1, 1990.

On January 14, 1991, the Commission[6] adopted a set of rules designed to establish standards and procedures for creating EAS routes throughout the state. WAC 480-120-400 to -435. EAS was defined by the Commission as "mandatory, two-way, seven digit local calling service between exchanges that provides the ability to call from one exchange to another exchange without incurring a toll charge." WAC 480-120-405(2). These new rules required the creation of EAS routes in certain circumstances (usually where fewer than 80 percent of intraLATA calls that originate in an exchange are local calls, *i.e.*, terminate in the same

---

[5]EAS capability had already been increasing. By the late 1980's, approximately two-thirds of exchanges had some EAS, to at least one other exchange. One hundred exchanges within this state, however, had no EAS. Many of the EAS routes were "cluster[ed] around urban areas", including Seattle, Tacoma, and Spokane.

[6]The Commission is charged with, among other things, regulating telecommunications companies within the state of Washington.

exchange), which converted certain frequently used routes from "toll" to "local" service. Unlimited calling was to be available within the EAS routes for a flat monthly fee.

One of the new rules promulgated by the Commission created a Community Calling Fund (CCF). WAC 480-120-425. Pursuant to the rule, the CCF would be funded by a charge levied on LEC's based on the number of exchange access lines controlled by them in the state. WAC 480-120-425 (2). Under a detailed formula set out in the rule, smaller LEC's that experience certain revenue shortfalls are eligible for support from the CCF. WAC 480-120-425(3), (4). Larger LEC's, those with more than 150,000 access lines, are not eligible to draw support from the CCF.WAC 480-120-425(4) . The two largest LEC's[7] are U S WEST and GTE Northwest (GTE), and they are not eligible for CCF support.[8]

The stated rationale for the CCF was to "cushion the local rate effect" of EAS on customers of smaller LEC's and to provide revenue support for smaller LEC's whose main source of income was from "toll" calls. Because EAS transformed "toll" calls into "local" calls, the LEC's were faced with a loss of revenue from the access charges that the LEC's had previously acquired from interexchange companies when a telephone call either originated or terminated in an exchange. Furthermore, these LEC's were faced with the specter of incurring other costs for engineering changes, facility construction, and development costs inherent in the transformation to EAS routes. The Commission was concerned that smaller LEC's would incur severe revenue losses that could only be made up by "substantial" increases in local rates on the "relatively few customers" of smaller LEC's.

On June 26, 1991, WITA[9] commenced the present action by filing a petition for declaratory judgment in Thurston

---

[7]There are 24 LEC's serving exchanges in Washington, ranging in size from U S WEST, which serves approximately 100 exchanges, to other LEC's that serve only one exchange.

[8]U S WEST and GTE control over 90 percent of the over two million access lines in the state. Thus, the smaller LEC's are the only beneficiaries of the CCF.

[9]WITA is a nonprofit association made up of all LEC's operating in Washington, with the exception of U S WEST.

County Superior Court. It named the Commission as a respondent and sought a declaration that the rule creating the CCF was "constitutional, [and] within the authority of the Commission to adopt". WITA maintained the suit because it was concerned that if it complied with the rules requiring the creation of new EAS routes, and the CCF was found to be invalidly promulgated, its members could be placed in a precarious financial situation. Telecommunications Ratepayers Association for Cost-Based and Equitable Rates (TRACER) and U S WEST were permitted, by stipulation, to intervene as parties.

TRACER[10] cross-petitioned for a declaration that the rule adopting the CCF was invalid, arguing that the creation of CCF exceeded the Commission's statutory authority and was an unconstitutional tax. U S WEST agreed with TRACER and submitted its brief. WITA disagreed, contending that the funding of CCF was constitutional, and that the Commission had statutory authority to promulgate the rule.

After extensive briefing and oral argument from all interested parties, the Thurston County Superior Court concluded that the rule was invalid on the basis that the Commission had no statutory authority to enact it. WITA has appealed to this court.

## I

Judicial review of the validity of a rule promulgated by an agency is governed by RCW 34.05.570. The burden of demonstrating the invalidity of agency action is on the party asserting invalidity. RCW 34.05.570(1)(a). In a proceeding involving the review of an agency rule, the reviewing court "shall declare the rule invalid . . . if it finds that [the rule] violates constitutional provisions, [or] exceeds the statutory authority of the agency . . .". RCW 34.05.570(2)(c). Our only concern is whether the Commission exceeded its statutory authority in enacting this particular rule.[11]

---

[10]TRACER is an association organized to "represent the interests of large users of telecommunications services".

[11]Although the parties also cite various cases involving the proper scope of review of the reasonableness of a regulation, we need not address that issue, as

■■ Administrative agencies are "creatures of the legislature without inherent or common-law powers", and they may exercise only those powers conferred on them "either expressly or by necessary implication". *Human Rights Comm'n v. Cheney Sch. Dist. 30*, 97 Wn.2d 118, 125, 641 P.2d 163 (1982) (quoting *State v. Munson*, 23 Wn. App. 522, 524, 597 P.2d 440 (1979)); *see Woolery v. Department of Social & Health Servs.*, 25 Wn. App. 762, 764, 612 P.2d 1, *review denied*, 94 Wn.2d 1009 (1980). We recently opined that "[t]he power and authority of an administrative agency is limited to that which is expressly granted by statute or necessarily implied therein." *McGuire v. State*, 58 Wn. App. 195, 198, 791 P.2d 929, *review denied*, 115 Wn.2d 1021 (1990), *cert. denied*, 499 U.S. 906 (1991). If an enabling statute does not authorize either expressly or by necessary implication a particular regulation, that regulation must be declared invalid despite its practical necessity or appropriateness. *See In re Consolidated Cases*, 123 Wn.2d 530, 540, 869 P.2d 1045 (1994) ("we do not defer to an agency the power to determine the scope of its own authority"); *cf. Hillis Homes, Inc. v. Snohomish Cy.*, 97 Wn.2d 804, 808, 650 P.2d 193 (1982).

■ In analyzing the enabling statutes, our primary objective is to find the intent of the Legislature. Where the language of a statute is plain and unambiguous, the meaning of the statute must be derived from the wording of the statute itself. *Rozner v. Bellevue*, 116 Wn.2d 342, 347, 804 P.2d 24 (1991).

## II

The aspect of the CCF that TRACER and U S WEST challenge is the method by which it is funded, *i.e.*, by a charge levied against all LEC's based on the number of access lines in their exchanges. WITA argues that the Commission's adoption of the CCF (specifically its funding mechanism) was within its statutory authority. WITA also

---

we are only asked to decide whether the enactment of the rule is within the statutory authority of the Commission.

argues that the CCF is necessary, useful, and beneficial for the telecommunications industry. We note, however, that the appropriateness or reasonableness of the CCF is not at issue, only the statutory authorization for its enactment. In support of its position, WITA points to three statutes that ostensibly confer the required authority to enact the rule creating the CCF. We will discuss each.

### A

WITA initially relies on RCW 80.36.160, which provides in part as follows:

> **Physical connections may be ordered, routing prescribed, and joint rates established.** In order to provide toll telephone service where no such service is available, or to promote the most expeditious handling or most direct routing of toll messages and conversations, or to prevent arbitrary or unreasonable practices which may result in the failure to utilize the toll facilities of all telecommunications companies equitably and effectively, the commission may, on its own motion, or upon complaint . . . (2) prescribe the routing of toll messages and conversations over such connections and the practices and regulations to be followed with respect to such routing; and/or (3) establish reasonable joint rates or charges by or over said lines and connections and just, reasonable and equitable divisions thereof as between the telecommunications companies participating therein.

WITA contends that this statute provides authority for the CCF because it permits the Commission to regulate "toll" telephone service by prescribing routing and establishing joint rates. In relying on this statute, WITA asserts that EAS is "toll" calling, which is merely billed at a "local" rate. It argues that the word "toll" is subject to two meanings, one being the price of a telephone call and the other being the type of service, *i.e.,* interexchange service. Pointing to the latter definition, it contends that the CCF is part of a reasonable joint rate between companies under the statute. TRACER disagrees, arguing that toll telephone service in the statute refers to the price of the call. Indeed, EAS is defined in both RCW 80.36.850 and WAC 480-120-405(2) as calling between exchanges without incurring a "toll" charge.

■ We deem it unnecessary to determine in what sense the Commission used the word "toll", because even if we agreed that EAS service constitutes a "toll" call, it being an interexchange call, there is no authority provided by this statute for enacting the CCF. In our judgment, the statute allows only for setting "joint rates" between the telecommunications companies participating in the call. Clearly, this does not authorize, either expressly or by necessary implication, a charge to be levied against all LEC's based on the number of access lines within an exchange, as the CCF contemplates.

The CCF charge has no relation to the telecommunications companies participating in facilitating the transmission of a telephone call. Indeed, the CCF charge does not relate to telephone calls in any way. It is a flat charge levied on all access lines, regardless of the frequency of their use. The CCF funding mechanism is well beyond the setting of a joint rate between companies. Thus, RCW 80.36.160 does not provide the Commission with authority to promulgate the CCF by regulation.

## B

WITA next asserts that the CCF was enacted pursuant to the authority of RCW 80.36.080, which provides as follows:

> **Rates, services, and facilities.** All rates, tolls, contracts and charges, rules and regulations of telecommunications companies, for messages, conversations, services rendered and equipment and facilities supplied, whether such message, conversation or service to be performed be over one company or line or over or by two or more companies or lines, shall be fair, just, reasonable and sufficient, and the service so to be rendered any person, firm or corporation by any telecommunications company shall be rendered and performed in a prompt, expeditious and efficient manner and the facilities, instrumentalities and equipment furnished by it shall be safe, kept in good condition and repair, and its appliances, instrumentalities and service shall be modern, adequate, sufficient and efficient.

WITA asserts that this statute provides the Commission with broad authority to regulate both intercompany rates and intracompany rates. Thus, it contends, the CCF, which

assesses a charge on all access lines and distributes the proceeds of the fund to some LEC's, is authorized by this broad grant of power.

The Washington Supreme Court has repeatedly stressed that the power of the Commission to set and regulate rates that utilities charge is broad. *People's Org. for Wash. Energy Resources v. Utilities & Transp. Comm'n*, 104 Wn.2d 798, 808, 711 P.2d 319 (1985). In *Energy Resources*, the court observed that the Commission must "not only assure fair prices and service to customers, but also to assure that regulated utilities earn enough to remain in business". 104 Wn.2d at 808. In that case, the court decided that a power utility could include in its rates costs incurred through an investment in an Oregon nuclear power reactor.

In *Jewell v. State Utils. & Transp. Comm'n*, 90 Wn.2d 775, 585 P. 2d 1167 (1978), our Supreme Court also discussed RCW 80.36.080. The court observed there that the statute granted broad rate-making power to the Commission. It noted, however, that although the direction was broadly stated, the legislative intent was "rather simple". *Jewell*, 90 Wn.2d at 777. "The public interest, in return for the grant of a monopoly, requires prompt, expeditious and efficient service. Quid pro quo, the company is entitled to rates which are fair, just, reasonable and sufficient to allow it to render such services." *Jewell*, 90 Wn.2d at 777.

In *Jewell*, the court examined the practice of telephone companies contributing to private charities and receiving an increase in rate charges to cover the contributions. The court concluded that this practice was not authorized or supported by RCW 80.36.080, noting that telephone users were not receiving any more prompt or expeditious service because of the charitable contributions. The court further observed that the statute did not direct that a telephone company be a "good corporate neighbor". *Jewell*, 90 Wn.2d at 777. The court disapproved of the fact that these contributions were being assessed against ratepayers and subscribers, calling the assessment an "involuntary contribution[ ]". *Jewell*, 90 Wn.2d at 778.

*Energy Resources* and *Jewell* both concerned the power of the Commission to set rates that utilities charge their customers, and the power of utilities to include various items in calculating the rates that they charge. The issue here is whether RCW 80.36.080 provides the Commission authority to impose a charge on all access lines, assess the charge against utilities (specifically LEC's), and then distribute the funds to other LEC's that incur losses through the conversion to EAS service. We conclude that it does not.

■ RCW 80.36.080 provides, by its own terms and through judicial interpretation, for the Commission's regulation of the rates that a utility itself charges its customers for providing services. The statute refers to rates and tolls of companies being just and reasonable. In our judgment, this does not confer power on the Commission, either expressly or impliedly, to impose its own charge on the company or ratepayers. Courts have similarly analyzed the Commission's power as involving the rates that a company charges to subscribers both for the service it provides and to meet its own revenue requirements. *See Jewell; Energy Resources.* The charge proposed in WAC 480-120-425 on access lines to fund the CCF is unrelated to service provided by the company. Nor is the charge related to revenue requirements of the LEC against which the charge is ostensibly assessed. It is only related to the Commission's general conclusion that some LEC's need to be compensated for lost revenue incurred during EAS conversion, and that sufficient compensation can be gained by charging other LEC's.

WITA contends, additionally, that the charge on all access lines to fund the CCF is not imposed on the ratepayers, but rather is imposed only on the LEC's. Even accepting that proposition, we still conclude that RCW 80.36.080 did not provide authority for the rule establishing the CCF, because that statute refers to the power to set rates charged by the company on persons and businesses. Thus, if the CCF access line "surcharge" is not a rate charged on persons or businesses, it is clearly not authorized by this statute. Either

way, RCW 80.36.080 does not provide authorization to impose such a charge on all LEC's to support the CCF.

## C

Finally, WITA relies on the implied authority of the Commission to fill in gaps through rulemaking to effect the whole statutory scheme. WITA calls our attention to RCW 80.01.040(3), which provides that the Commission is empowered to

[r]egulate in the public interest, as provided by the public service laws, the rates, services, facilities, and practices of all persons engaging within this state in the business of supplying any utility service . . . including . . . telecommunications companies . . ..

WITA contends that the creation of CCF was in the public interest, and it was within the Commission's ability to fill in gaps to effect the intent of the Legislature.

■ We disagree. The Washington Supreme Court addressed this same statute in the context of a different utility and observed that

[a]lthough RCW 80.01.040(3) demands regulation in the public. interest, that mandate is qualified by the following clause "as provided by the public service laws . . ." Appellants fail to point out any section of title 80 which suggests that nonregulated fuel oil dealers are within the jurisdictional concern of the commission. . . .

*Cole v. State Utils. & Transp. Comm'n*, 79 Wn.2d 302, 306, 485 P.2d 71 (1971).

Here, WITA has not cited any section of Title 80 of the Revised Code of Washington that permits the Commission to set up a fund, such as the CCF, to which all LEC's are required to contribute, but from which not all LEC's can draw. In light of our conclusions that neither RCW 80.36.080 nor RCW 80.36.160 authorizes the imposition of a charge on all access lines to fund the CCF, WITA's reliance on RCW 80.01.040(3) is of no avail. TRACER does not contest that the CCF may be in the public interest, but it correctly observes that the CCF is not authorized by the public service laws. As the court in *Cole* stated, "[a]n administrative

agency must be strictly limited in its operations to those powers granted by the legislature." 79 Wn.2d at 306.[12]

### III

█ TRACER contends, additionally, that the Commission's adoption of the rule creating the CCF was an unconstitutional exercise of the power to tax. Because we conclude that the Commission was without statutory authority to promulgate the regulation at issue here, we need not address this challenge to the constitutionality of the rule. *See Tropiano v. Tacoma*, 105 Wn.2d 873, 877, 718 P.2d 801 (1986).

Affirmed.

MORGAN, C.J., and SEINFELD, J., concur.

---

[12]Interestingly, WITA does not rely on the statute that established a pilot program for EAS, RCW 80.36.855. Its terms demonstrate why WITA does not rely on it. Under the pilot program, EAS service could only be obtained in the "service territory of the local exchange company that provides service to the petitioner". RCW 80.36.855. Thus, EAS service could be created only within the exchanges controlled by one LEC. The Commission was empowered, if the LEC experienced a revenue deficiency, to allocate revenue in a fair, just, and reasonable manner among "all classes of customers". RCW 80.36.855(6). In other words, the Commission could reallocate revenue among business and residential users, and other classes of users. This reallocation, however, was only permitted within the territory of an individual LEC, not between LEC's.

RCW 80.36.855 does not provide support for the Commission's authority to essentially allocate rates between companies by assessing a charge against all LEC's based on the number of access lines and using that revenue to fund possible losses of only some LEC's. It is also instructive that the Legislature, in enacting the EAS pilot program, provided that the Commission submit a report to the Legislature recommending "any other legislation addressing the issue of extended area service". Laws of 1989, ch. 282, § 4. Indeed, if intercompany allocation of revenue is necessary to properly finance conversion to EAS routes, the Legislature must provide such authority to the Commission. It has not yet done so.