166 P.3d 732 (2007)
QWEST CORPORATION, a Colorado corporation, Appellant,
v.
WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION, Respondent.
No. 34523-4-II.
Court of Appeals of Washington, Division 2.
August 21, 2007.
*733 Timothy J. O'connell, Stoel Rives LLP, Seattle, WA, for Appellant.
Gregory J. Trautman, Olympia, WA, for Respondent.
PENOYAR, J.
¶ 1 The Washington Utilities and Transportation Commission (WUTC) enacted two new rules creating reporting requirements: (1) the Cash Transfer Rule, requiring noninvestment grade utilities to give WUTC five days' notice before making large cash transfers to its subsidiaries or affiliated companies; and (2) the Subsidiary Reporting Rule, requiring all regulated telecommunications companies to file annual reports describing nearly all transactions between the parent company and its subsidiaries and affiliated companies. The trial court denied Qwest's petition for a declaratory judgment invalidating the rules, and this appeal followed. Qwest argues that (1) the trial court applied the incorrect standard of review, and (2) WUTC exceeded its statutory authority when it enacted the two rules. Qwest's arguments do not merit reversal. Under the correct standard of review, WUTC did not exceed its statutory authority in enacting the rules, and we affirm.

FACTS
¶ 2 After a lengthy rulemaking process, WUTC adopted two rules issuing new reporting requirements for telecommunications companies: WAC 480-120-369 ("Cash Transfer Rule")[1] and WAC 480-120-395 ("Subsidiary *734 Reporting Rule").[2] Under the Cash Transfer Rule, a non-investment grade telecommunications company (one whose corporate/issue rating is not in one of the four highest rating categories of either Standard & Poor's LLC or Moody's Investor Services) must provide WUTC with at least five days' notice before transferring large cash amounts or assuming the obligations or liabilities of any of its affiliated interests or subsidiaries. Under the Subsidiary Reporting Rule, all regulated telecommunications companies must file an annual report summarizing nearly all transactions between the company and its affiliated interests or subsidiaries.
¶ 3 WUTC enacted these rules under RCW 80.04.080, which confers authority upon WUTC to require "any public service company to file . . . periodical and special . . . reports concerning any matter about which WUTC is authorized or required by this or any other law, to inquire into or keep itself informed about, or which it is required to enforce." RCW 80.04.080.
¶ 4 WUTC also invoked its authority under RCW 80.04.070 to enact the Subsidiary Reporting Rule. RCW 80.04.070 allows WUTC, "at any and all times, to inspect the accounts, books, papers and documents of any public service company." RCW 80.04.070.
¶ 5 Qwest is a Colorado corporation authorized to do business in Washington State; it is a telecommunications company subject to WUTC jurisdiction. Qwest does not have a corporate rating in one of the four highest rating categories from either Standard & Poor's LLC or Moody's Investor Service, Inc., and it is therefore subject to both the Cash Transfer and Subsidiary Reporting Rules.
¶ 6 On July 8, 2005, Qwest petitioned for an order to vacate and a declaratory judgment that the Cash Transfer and Subsidiary Reporting Rules were invalid. It also sought a declaratory judgment invalidating WUTC's adoption of these rules. After briefing and oral argument, the trial court denied Qwest's petition for review and declaratory judgment, finding that WUTC's enactment of both the Cash Transfer Rule and Subsidiary Reporting Rule was within its statutory authority, and that Qwest had not shown substantial prejudice by WUTC's actions. This appeal followed.

ANALYSIS
I. Standard of Review
¶ 7 We review questions of law, including decisions based on statutory interpretation, de novo. Advanced Silicon Materials, LLC v. Grant County, 156 Wash.2d 84, 89, 124 P.3d 294 (2005). Here, the trial court concluded that (1) Qwest was unable to show that WUTC had exceeded its authority in enacting the rules, and (2) Qwest had not shown substantial prejudice. On appeal, Qwest argues in part that the trial court applied an incorrect standard of review  substantial prejudice  rather than the statutory standard of review  impairment or interference with a legal right or privilege. RCW 34.05.570(2)(b)(i).
¶ 8 Qwest is partially correct. The trial court should not have applied a "substantial prejudice" standard. However, the trial court was entirely correct to require Qwest to establish that WUTC exceeded its authority in enacting the rules.
¶ 9 The "substantial prejudice" standard is found in RCW 34.05.570(1)(d), which states *735 that a court shall grant relief for an invalid agency action only if it determines that the action substantially prejudices the person seeking relief. However, subsection (2) provides that the validity of any rule may be determined when it appears that "the rule, or its threatened application, interferes with or impairs or immediately threatens to interfere with or impair the legal rights or privileges of the petitioner." RCW 34.05.570(2)(b)(i).
¶ 10 The record shows that the rules clearly interfered with Qwest's "legal rights or privileges." The information required by WUTC under the new rules had previously been part of Qwest's confidential business records, and the rules directly interfered with Qwest's right to keep these records confidential.
¶ 11 Despite this, the trial court correctly required that Qwest establish how WUTC's rules exceeded its statutory authority. By its plain language, RCW 34.05.570(2)(c) states the correct standard of review when a court is determining the validity of a rule. "This court may declare an agency rule invalid if it: (1) violates constitutional provisions, (2) exceeds statutory authority of the agency, (3) was adopted without compliance to statutory rule-making procedures, or (4) is arbitrary and capricious." Ass'n of Wash. Bus. v. Dep't of Revenue, 155 Wash.2d 430, 437, 120 P.3d 46 (2005) (quoting Wash. Pub. Ports Ass'n v. Dep't of Revenue, 148 Wash.2d 637, 645, 62 P.3d 462 (2003)); RCW 34.05.570(2)(c). Of these, Qwest argued only that WUTC exceeded its statutory authority. The trial court disagreed, and it therefore denied Qwest's petition for declaratory judgment.
¶ 12 In sum, the trial court erred by asking Qwest to show substantial prejudice when only impairment is required, but this error was harmless. Error without prejudice is not grounds for reversal, and error is not prejudicial unless it affects the case outcome. Brown v. Spokane County Fire Prot. Dist. No. 1, 100 Wash.2d 188, 196, 668 P.2d 571 (1983). Here, the trial court properly required Qwest to establish that WUTC had exceeded its statutory authority, and Qwest could not do so.
II. Statutory Authority
A. Cash Transfer Rule
¶ 13 Qwest argues that the WUTC exceeded its statutory authority in adopting the Cash Transfer Rule because (1) RCW 80.04.080 does not grant the WUTC authority to adopt such a rule, and (2) the statutory authorities cited by WUTC after the rulemaking do not provide the required nexus.
¶ 14 WUTC responds that RCW 80.04.080 grants it broad authority to require public utilities to report their activities. The lack of the specific phrase, "cash transfers," in the statute does not, according to WUTC, limit its authority to require reports of such transfers. WUTC also points out that it narrowly tailored the Cash Transfer Rule, applying it only to non-investment grade telecommunications companies, to ensure that the reporting requirements were limited to those utilities whose large cash transfers pose the greatest concern to ratepayers and the Commission.
¶ 15 Where statutory language is "plain, free from ambiguity and devoid of uncertainty, there is no room for construction because the legislative intention derives solely from the language of the statute." Bravo v. Dolsen Cos., 125 Wash.2d 745, 752, 888 P.2d 147 (1995) (quoting Krystad v. Lau, 65 Wash.2d 827, 844, 400 P.2d 72 (1965)); see also Berrocal v. Fernandez, 155 Wash.2d 585, 590, 121 P.3d 82 (2005). In undertaking a plain language analysis, the court must remain careful to avoid "unlikely, absurd, or strained" results. Burton v. Lehman, 153 Wash.2d 416, 423, 103 P.3d 1230 (2005) (quoting State v. Stannard, 109 Wash.2d 29, 36, 742 P.2d 1244 (1987)). "Only where the legislative intent is not clear from the statute's words may the court resort to extrinsic aids." Berrocal, 155 Wash.2d at 590, 121 P.3d 82 (quoting Burton, 153 Wash.2d at 423, 103 P.3d 1230).
¶ 16 In its general order, WUTC identified RCW 80.04.080 as its authority for adopting the Cash Transfer Rule. AR at 1353. RCW 80.04.080 provides, in relevant part:
"[WUTC] shall have authority to require any public service company to file monthly reports of earnings and expenses, and to *736 file periodical or special, or both periodical and special, reports concerning any matter about which [WUTC] is authorized or required by this or any other law, to inquire into or keep itself informed about, or which it is required to enforce. . . . "
RCW 80.04.080 (emphasis added). By its plain language, RCW 80.04.080 grants broad authority to WUTC to require reports from public service companies. The issue here is whether cash transfers are "any matter about which [WUTC] is authorized or required by this or any other law, to inquire into. . . ."
¶ 17 RCW 80.04.080 also sets out the requirements of every public service company's annual report to WUTC. Such reports must "show in detail . . . the earnings or receipts from each franchise or business and from all sources . . . and a complete exhibit of the financial operations of the company. Such report shall also contain such information in relation to rates, charges, or regulations concerning charges, or agreements, arrangements or contracts affecting the same, as the commission may require." RCW 80.04.080. Cash transfers would be included in a "complete exhibit of the financial operations of the company" and would also likely be included as information relating to rates and charges, and agreements affecting the same. By requiring their inclusion in the annual report, RCW 80.04.080 clearly authorizes WUTC to inquire into and keep itself informed about cash transfers. Because WUTC is authorized to inquire into cash transfers, it also has the authority to require "special reports" on them, under RCW 80.04.080. Therefore, WUTC did not act outside its statutory authority by requiring certain companies to report large cash transfers.
¶ 18 Qwest compares the situation here to that in Wash. Indep. Tel. Ass'n v. Telecomm. Ratepayers Ass'n for Cost-Based & Equitable Rates (TRACER), 75 Wash.App. 356, 880 P.2d 50 (1994), where this court found that the general grant of power to WUTC to regulate rates (RCW 80.01.040(3)) did not authorize the Commission to impose an additional charge in order to create a community calling fund. TRACER, 75 Wash.App. at 368-69, 880 P.2d 50. This court held that WUTC could not assess such a charge without an additional, specific statutory grant of authority. TRACER, 75 Wash.App. at 368, 880 P.2d 50.
¶ 19 TRACER is distinguishable. Here, RCW 80.04.080 allows WUTC to require periodic or special reports concerning any matter which the commission is authorized "to inquire into or keep itself informed about, or which it is required to enforce." RCW 84.04.080. This is a much broader grant of power than that in TRACER, where the relevant statute only allowed WUTC to "regulate in the public interest . . . rates, services, facilities, and practices." RCW 80.01.040(3).
¶ 20 Qwest also argues that the Cash Transfer Rule exceeds WUTC's authority because it applies to more than just public services companies  it also applies to subsidiaries and affiliates of telecommunications companies, "which, in many instances, may not be public service companies." Appellant's Br. at 16-17. However, the plain language of the Cash Transfer Rule does not support this argument. The rule requires "the company" to report on transfers between telecommunications companies or their subsidiaries and other subsidiaries or affiliates, and "[c]ompany" is defined as "any telecommunications company. . . ." WAC 480-120-369, -021. The Cash Transfer Rule, therefore, imposes no reporting requirement on any subsidiaries, regardless of whether they are public service companies.[3] Qwest's argument is not persuasive.
B. Subsidiary Reporting Rule
¶ 21 Qwest also argues that WUTC exceeded its statutory authority in adopting the Subsidiary Reporting Rule. Raising essentially the same arguments as it raised against the Cash Transfer Rule, Qwest claims that neither RCW 80.04.080 nor any other law grants WUTC the authority to *737 impose subsidiary reporting requirements.[4] WUTC responds that the Subsidiary Reporting Rule is within both the broad authority granted to it under RCW 84.04.080 and the specific authority to inspect the accounts and books of any public service company, granted under RCW 84.04.070.
¶ 22 Under the plain language rule of statutory interpretation, above, we will only examine extrinsic evidence when the statute's plain language is ambiguous. Here, the plain language of RCW 84.04.080 grants WUTC the authority to require reports from public service companies regarding "any matter about which [WUTC] is authorized or required by this or any other law, to inquire into. . . ." RCW 84.04.070 authorizes WUTC, "at any and all times, to inspect the accounts, books, papers and documents of any public service company." The accounts and books are a matter that WUTC is authorized to inquire into, and WUTC is therefore authorized under RCW 84.04.080 to require reporting on the matter. The Subsidiary Reporting Rule is within the authority granted to WUTC under the plain language of the statutes. Qwest has not met its burden of establishing that enacting the Subsidiary Reporting Rule exceeded WUTC's statutory authority; we will not invalidate the rule.
¶ 23 Qwest also argues that "the language of RCW 80.04.070 plainly does not include subsidiary corporations." Appellant's Br. at 27. The language of RCW 80.04.070 grants WUTC authority over all public service companies, similar to the language in RCW 80.04.080 (examined above). The Subsidiary Reporting Rule applies to telecommunications companies subject to the provisions in chapter 80.16 RCW. WAC 480-120-395. Chapter 80.16 RCW applies to every public service company and its affiliated interests; it does not include small local exchange companies. See RCW 80.16.020, .055. Here, similar to the Cash Transfer Rule, the Subsidiary Reporting Rule requires that the telecommunications company report all transactions with its subsidiaries and affiliated interests. WAC 480-120-395. All telecommunications companies are public service companies, see RCW 80.04.010, so the rule is clearly within WUTC's authority under RCW 80.04.070.
¶ 24 Qwest also claims that WUTC has historically acknowledged a distinction between its treatment of subsidiaries and affiliates. To support this contention, Qwest cites to the Waste Management of Seattle and Puget Sound Energy decisions. Waste Mgmt. of Seattle, Inc. v. WUTC, 123 Wash.2d 621, 869 P.2d 1034 (1994); In re Puget Sound Energy, Inc., No. UE-980866, Utils. & Transp. Comm'n (Wash. Sept. 24, 1998).
¶ 25 Neither these decisions nor the statutory language in chapter 80.16 RCW supports Qwest's claims. In Waste Management, WUTC analogized its use of its general rate-making authority over parent-subsidiary transactions to its use of the same authority over corporate-affiliated interest transactions. Waste Mgmt., 123 Wash.2d at 636, 869 P.2d 1034. The analogy was not necessarily a recognition of a distinction between the two, as Qwest argues, but instead illustrates that WUTC considered both subsidiaries and affiliates within its umbrella of review.
¶ 26 In Puget Sound Energy, an order from WUTC regarding approval of agreements between PSE and its subsidiary, WUTC merely drew a distinction between its sources of authority to review transactions between parents and subsidiaries ("general rate-making authority") and transactions between companies and affiliates (RCW 80.16.030). Again, the Order did not necessarily acknowledge a difference in how WUTC reviews the two types of transactions.
¶ 27 Finally, as stated above, the statutory definition of "affiliated interest" does not exclude *738 subsidiaries but, on the contrary, includes several ("[e]very corporation or person with which the public service company has a management or service contract"). RCW 80.16.010. Qwest has not established that subsidiaries are excluded from this category, nor has it shown that WUTC exceeded its authority in enacting the Subsidiary Reporting Rule.
¶ 28 Because Qwest has not met its burden of establishing that WUTC exceeded its statutory authority in enacting the Subsidiary Reporting Rule, we will not invalidate the rule.
¶ 29 We affirm.
We concur: HOUGHTON, C.J. and VAN DEREN, J.
NOTES
[1] The Cash Transfer Rule states, in relevant part:

(1) At least five business days before a telecommunications company whose corporate/issuer rating is not in one of the four highest rating categories of either Standard & Poor's L.L.C. or Moody's Investors Service, Inc., or its subsidiary transfers cash to any of its affiliated interests or subsidiaries or assumes an obligation or liability of any of its affiliated interests or any of its subsidiaries, the company must report to the commission an estimate of the amount to be transferred and the terms of the transaction. . . .
(a) The company must report if the cumulative transactions to a subsidiary or affiliated interest for the prior twelve months exceed a threshold of five percent . . .
(b) When the threshold in (a) of this subsection has been reached, the company must report each subsequent transaction exceeding a threshold of one percent for the prior twelve-month period. . . .
WAC 480-120-369.
[2] The Subsidiary Reporting Rule states, in relevant part:

(1) By June 1 of each year, each telecommunications company subject to the provisions of chapter 80.16 RCW must file a report summarizing all transactions, except for transactions provided at tariff rates, that occurred between the company and its affiliated interests, and the company and its subsidiaries, during the period January 1 through December 31 of the preceding year.
WAC 480-120-395.
[3] We note that it is the parent telecommunications company, Qwest, which is a party to this case. There are no subsidiaries, public service companies or otherwise, who are joined in this action, so the question of how this rule affects such subsidiaries is not properly before us.
[4] Chapter 80.16 RCW authorizes reports relating only to "affiliated interest" transactions, and Qwest contends that subsidiaries are excluded from this group. Appellant's Br. at 26-27. This contention misconstrues the law. Chapter 80.16 RCW, the affiliated interest chapter, specifically includes in its definition of "affiliated interest" "[e]very corporation or person with which the public service company has a management or service contract." RCW 80.16.010. This definition necessarily will include several subsidiaries, and it illustrates that the two categories of companies are not viewed as distinctly separate as Qwest claims.