IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CENTURYLINK COMMUNICATIONS, LLC, <br><br>                 Appellant, <br><br>     v. <br><br> WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION, <br><br>                 Respondent. | No. 86763-6-I <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION |

COBURN, J. — In December 2018 a major services outage occurred in Washington's 911 telecommunications network resulting in the failure of more than 13,000 911 calls. At the time CenturyLink Communications, LLC (CenturyLink) and Comtech were both contracted to provide telecommunications services through the network. The two companies were in a transition period at the end of which Comtech would assume responsibility for the entire network. After an investigation of the outage, the Washington Utilities and Transportation Commission (Commission) Staff filed a complaint against CenturyLink alleging multiple statutory and regulatory violations. After a review of pre-filed testimony and a two-day evidentiary hearing, the Commission found that, in part, CenturyLink violated RCW 80.36.080 and imposed a total penalty of more than $1.3 million. CenturyLink appeals, arguing that (1) the Commission erroneously applied RCW 80.36.080, (2) the Commission's finding of liability violates due process, (3) the Commission's factual findings are not supported by substantial

evidence, and (4) the Commission acted arbitrarily and capriciously. Finding no error, we affirm.

FACTS

Washington's 911 Network

*A. The Parties*

The parties to this appeal are:

(1) Appellants: CenturyLink,[1] a public service company that provides telecommunication services and that is regulated by the Commission.[2]

(2) Respondents: the Commission. The Commission is the administrative agency charged by statute with regulating public service companies in the public interest, including the services and practices of telecommunications companies. RCW 80.01.040;[3] see ch. 80.36 RCW.

(3) Intervenor-Respondent: Washington State Military Department (WMD).[4] The WMD Enhanced 911 Coordination Office contracts for all Washington state 911

---

[1] The Commission notes in its response brief that CenturyLink changed its name to Lumen during the pendency of the matter below. This opinion refers to the company as CenturyLink consistent with the parties' briefing.

[2] In the proceedings below, the Commission's staff (the Staff) participated as a party. See RCW 34.05.455; WAC 480-07-310; ch. 480-120 WAC.

[3] Under RCW 80.01.040, the Commission shall:

(1) Exercise all the powers and perform all the duties prescribed by this title and by Title 81 RCW, or by any other law.

….

(3) Regulate in the public interest, as provided by the public service laws, the rates, services, facilities, and practices of all persons engaging within this state in the business of supplying any utility service or commodity to the public for compensation.

(4) Make rules and regulations necessary to carry out its other powers and duties.

[4] WMD filed a response brief with this court, in which it states that its "role in this appeal is limited to protecting confidential information regarding the Washington State's 911 system." WMD does not assign error to the Commission's underlying orders.

communication services. As a state 911 coordination office, WMD is statutorily authorized to "[p]rovid[e] and support[] 911 emergency communications systems, which may include procurement, funding, ownership, and management." RCW 38.52.520(3). WMD is also authorized to establish rules that "[s]pecify statewide 911 emergency communications system and service standards, consistent with applicable state and federal law." RCW 38.52.520(8)(c).

Though they are not parties on appeal, the Public Counsel Unit of the Washington Attorney General's Office (Public Counsel) and Comtech also participated as parties in the proceedings below. Public Counsel is the statutory representative of CenturyLink's telecommunications customers in Washington. RCW 80.01.100, 80.04.510. Comtech[5] is another state telecommunication services provider.

### B. CenturyLink and Comtech as Joint Providers

In 2009 WMD contracted with CenturyLink for the provision and maintenance of state 911 telecommunication services through the Emergency Services Internet Protocol 911 Network (ESInet I). Through the ESInet I network, 911 calls were received and routed from the originating 911 telecommunications service provider to 911 call centers or "Public Safety Answering Points" (PSAPs).

In 2016 WMD contracted with a new statewide provider, Comtech, "for a next generation" 911 network known as ESInet II. As a result, a three-phase process was initiated to facilitate the transition of statewide 911 services from CenturyLink to

---

[5] The Commission also notes in its briefing that Comtech has had different names through this matter, such as TSYS and Telecommunications Systems, Inc. This opinion refers to the company as Comtech consistent with the parties' briefing.

Comtech. During this transition period, both CenturyLink and Comtech were contracted to provide state 911 services.

The introduction of Comtech as a new state 911 telecommunications services provider required amendments to CenturyLink's original contract with WMD. Amendment J outlined the transition plan between CenturyLink and Comtech, and required CenturyLink to "provide … all services, information and data reasonably necessary to effectuate an orderly and seamless transition to … [a] successor provider and to ensure that there is no interruption of 9-1-1 service in the State of Washington." This included, in part, for CenturyLink to "provid[e] such other materials and information as may be needed or required to reasonably effectuate a successor provider."

Additionally, Amendment M states:

a) Covered 911 Service Provider[6] during PSAP Migration. The Department is transitioning the ESINet services to a successor provider via a phased cutover of PSAPs from Contractor's ESInet I to New Contractor's ESInet II ("PSAP Migration"). Prior to this cutover, Contractor shall route calls over ESInet I to the appropriate PSAPs and, as such, during this time, Contractor is a Covered 911 Service Provider as defined in 47 C.F.R. § 12.4(a)(i)(A) ("Covered 911 Service Provider") for all PSAPs in the State. Upon the Department's cut over of one or more PSAPs to ESInet II ("Migrated PSAPs"), the Department's successor provider shall be a Covered 911 Service Provider for such Migrated PSAPs and shall be solely responsible for routing calls from the Demarcation Point[7]

---

[6] Public Counsel's 911 telecommunications services expert witness Brian Rosen testified that "Covered 9-1-1 Service Provider" is a legal term in the Federal Communications Commission (FCC) regulations that defines responsibilities for 911 service providers. "Among other things, the FCC requires Covered 9-1-1 Service Providers to meet certain notification obligations." See Kries v. WA-SPOK Primary Care, LLC, 190 Wn. App. 98, 120, 362 P.3d 974 (2015) (stating that although expert testimony is generally inadmissible to interpret a contract, there is an exception where expert testimony is "used to explain the meaning of technical terms and words of art").

[7] CenturyLink conceded during administrative proceedings that Amendment M does not specify the physical location of a demarcation point. Rosen opined that in the context of telecommunications services, a demarcation point is generally described in the contract between the parties and identifies an agreed upon point "where responsibility shifts from one service provider to another."

between ESInet I and ESInet II to such Migrated PSAPs. During the PSAP Migration, Contractor remains responsible for routing calls to PSAPs that not have not migrated to ESInet II ("Unmigrated PSAPs"), and for routing calls intended for Migrated PSAPs to the Demarcation Point at ESInet II, at which point the successor provider assumes responsibility for delivering such calls to Migrated PSAPs and is therefore the Covered 911 Service Provider.

WMD, CenturyLink, and Comtech also agreed to a Scope of Work (SOW) regarding the transition plan between the two telecommunications providers.

The first phase of the transition period involved the batch migration of PSAPs from CenturyLink's ESInet I network to Comtech's ESInet II network. During this time, 911 calls first went to CenturyLink. CenturyLink determined which calls were destined for PSAPs served by Comtech, and passed these calls through an interface between CenturyLink and Comtech. Comtech then routed these calls to the proper PSAP.

During the transition period, the companies' two ESInet networks were connected by a Signaling System 7 (SS7). In an SS7 system, signaling messages pass from an originating device to a terminating device to alert the other side of an incoming call. CenturyLink used third-party vendor Intrado for its ESInet I. CenturyLink/Intrado's system had to interconnect with Comtech's system to effectuate the transition between CenturyLink and Comtech. For the interface between CenturyLink and Comtech, the originating device was the Intrado Gateway that was between CenturyLink/Intrado's ESInet I and the SS7 system. The terminating device was the Comtech gateway between the SS7 system and Comtech's ESInet II. Signaling messages passed through one or more Signaling Transfer Points (STPs), which are switches that route the SS7 signaling messages from the originating device to the terminating device. The STPs were supplied by the Transaction Network Services, Inc. (TNS).

At the time of the outage, the system was designed to work so that when a caller called 911, the call crossed CenturyLink/Intrado's ESInet I to the Intrado Gateway. Calls intended for PSAPs that had already been migrated to Comtech's ESInet II would then be routed to the interface between CenturyLink/Intrado's ESInet I and Comtech's ESInet II, which consisted of the Intrado and Comtech gateways connected by the SS7 system. A call set-up signaling message would then originate from the Intrado Gateway (originating device) to be sent through TNS' network of STPs to Comtech's STP and then to the Comtech Gateway (terminating device). After the set-up message travelled through the STPs to the Comtech Gateway, an acknowledgment of the set-up message would be sent back through the SS7 system to the Intrado Gateway and the call would be accepted. The Intrado and Comtech gateways each consisted of two physical gateways. Each gateway had two signaling circuits that connected to the STPs. Thus, there were four SS7 signaling circuits at each end. If none of the four circuits was functioning, then calls could not complete by crossing the interconnect between Intrado and Comtech.

C.  *Circuit Diversity*

To protect against network outages or single points of failure within a network, 911 telecommunications networks build in diversity of routes, facilities, and suppliers.[8] Circuit supplier and network diversity is intended to ensure that a single network crash will not prevent 911 calls from completing. Recommended SS7 network design requires

---

[8] According to the National Emergency Number Association, "A best practice when designing connections into an ESInet is to utilize a mix of diverse transport mediums, technologies and service providers as is operationally and economically feasible. The emphasis on 'no single point of failure' in 9-1-1 applies to all ESInets." Important considerations include, among others, circuit diversity and network diversity.

circuit diversity.

Initially, as part of the network's original design and related testing,[9] Comtech had two of their SS7 circuits on CenturyLink's nationwide fiber optic Green Network and two of their circuits on another provider's network.[10] CenturyLink had two of their SS7 circuits on their Green Network and two on Qwest Corporation's local network. Comtech and CenturyLink's use of two different suppliers for their SS7 circuits at the time of the shared 911 network's initial installation meant that each side of the 911 network had supplier diversity.

In fall 2017 Comtech's other circuit provider announced it planned to disconnect their two circuits. After determining another provider was unable to meet the provisioning deadline, Comtech's signaling provider TNS ordered two replacement circuits from CenturyLink on behalf of Comtech. Around fall 2018, Comtech's other circuit provider disconnected their two circuits. CenturyLink placed Comtech's replacement SS7 signaling circuits on CenturyLink's Green Network. Thus, with its four SS7 signaling circuits on CenturyLink's Green Network, Comtech's ESInet II lacked supplier and network diversity leading up to the outage.[11] Comtech's ESInet II relied on

---

[9] Testing of the original network design occurred in the first half of 2017. CenturyLink completed the testing pursuant to the parties' SOW.

[10] An SS7-based system's signaling circuits are set up in mated pairs.

[11] In its reply brief, CenturyLink asserts that its formal ordering process was not used to order diverse replacement circuits for Comtech's ESInet II network. In support, CenturyLink quotes its witness and vice president of network operations Martin Valence's testimony in part stating that Comtech "emailed a retail order that simply identified its need for circuits connecting certain locations." CenturyLink argues that "[i]f Comtech had used the process designed to obtain diverse circuits, CenturyLink could have provided Comtech with SS7 links that contained both network and carrier diversity." After being asked during oral argument why then did CenturyLink process the emailed order instead of requesting Comtech use CenturyLink's portal, CenturyLink asserted, contrary to the record and Valence's own testimony, that "every single circuit is ordered through a portal," and that Comtech instead did not utilize "the portion of the portal that … requires diversity." Wash. Ct. of Appeals oral arg., supra, at 23 min. 35 sec. through 24 min. 42 sec. Valence's testimony in regard to the replacement circuits was that

CenturyLink's Green Network for all 911 calls to its PSAPs.

## The Outage

On December 27, 2018, CenturyLink's Green Network experienced a "packet storm" caused by four malformed packets of data that resulted in a major service outage[12] that affected multiple states.[13] The outage interrupted Washington 911 services intermittently over a three-day period, with a complete outage between 12:40 a.m. on December 27 and 8:36 p.m. on December 28. The outage occurred during the first phase of CenturyLink and Comtech's transition period. At the time of the outage, 47 PSAPs had transitioned from CenturyLink's ESInet I network to Comtech's ESInet II network. Fifteen PSAPs remained on CenturyLink's ESInet I network.

Because all four of Comtech's SS7 circuits for its ESInet II network relied on CenturyLink's Green Network for call services to its 47 PSAPs, the Green Network's outage resulted in the failure of more than 13,000 calls destined to Comtech's PSAPs. By contrast, because CenturyLink's SS7 circuits were diverse and utilized the national CenturyLink network as well as Qwest Corporation's network, calls traversing CenturyLink's ESInet I network to CenturyLink's 15 PSAPs were not affected by the nationwide Green Network outage. The Commission made the following undisputed finding regarding the outage:

---

"Comtech did not utilize the wholesale portal at all. Instead, Comtech merely emailed a retail order that simply identified its need for circuits connecting certain locations."

[12] The Commission found, and it is undisputed, that "[t]he outage was a 'major outage' as defined in … [WAC] 480-120-021," which is "a service failure lasting for thirty or more minutes that causes the disruption of local exchange or toll services to more than one thousand customers; total loss of service to a public safety answering point or emergency response agency."

[13] Rosen described the nationwide failure of CenturyLink's Green Network as resulting in "a never-ending feedback loop" that inhibited call routing and data transmission.

To protect against network issues like the packet storm in this case, [enhanced 911] telecommunications networks incorporate diversity of routes, facilities, and providers. CenturyLink deployed such diversity in its own network, and, as a result, few if any [enhanced 911] calls to the PSAPs CenturyLink continued to serve directly failed as a result of the packet storm. Comtech, on the other hand, used circuits it obtained solely from CenturyLink, all of which experienced significant failures.

Administrative Proceedings

In December 2020 the Commission through its regulatory Staff issued a complaint against CenturyLink. The Commission granted WMD's and Comtech's petitions to intervene. CenturyLink, the Staff, and Public Counsel submitted pre-filed testimony prior to a two-day evidentiary hearing held in December 2022.

CenturyLink claimed, and maintains on appeal, that it did not know that Comtech modified its network to use non-diverse SS7 circuits and should not be held liable for Comtech's unilateral decision to change its network.

The following is a summary of relevant testimony presented to the Commission.

A. *Presented Evidence*

Public Counsel's expert Rosen said, "In building 9-1-1 systems, I generally advise that supplier diversity be used to guard against the kind of failure that occurred here." Rosen opined that although the failure of the non-diverse SS7 circuits triggered the 911 service interruption, "[t]he way CenturyLink designed the interconnection between the CenturyLink/Intrado system and the Comtech system was unnecessarily complex and contributed to the December 2018 system failure." Rosen testified that both CenturyLink/Intrado's ESInet network and Comtech's ESInet network were based on Internet Protocol (IP).

9

In a response to Public Counsel's data request, Comtech stated that it had initially planned on using a direct IP interconnection between the companies' ESInet I and ESInet II networks, but CenturyLink refused, "forcing" Comtech to use a SS7-based system to connect networks. Comtech stated that CenturyLink's refusal to interconnect directly required Comtech to use TNS as a third-party provider for the SS7 interconnection, which is not a 911 provider. In meetings with WMD, Comtech continued to try to persuade CenturyLink to connect directly with IP-based circuits, but CenturyLink "held fast to its refusal."[14]

The record shows that CenturyLink later proposed a form of interconnection, which Comtech declined for apparently logistical reasons. Rosen opined:

> Adding another entity [such as TNS] to the path increases the probability of failure. In fact, since both Intrado and Comtech were using gateways between their respective ESInet[] [networks] and the SS7 connections that CenturyLink required, adding the third party greatly increased the complexity of the interconnect. Simpler arrangements should have been made, which would have significantly reduced the risk of failure.

Rosen testified to the technical complexity of the SS7-based system, including the system requiring calls to be converted between SS7 and IP at least three times as they moved through the system. Rosen opined that, in addition to the lack of diverse SS7 circuits, the "system failure occurred because CenturyLink insisted on using an SS7-based system to interconnect with Comtech." Based on "the complexity of having an SS7 network in the middle of two IP networks," Rosen opined that neither CenturyLink nor Comtech should be relieved from responsibility. Rosen opined:

> Both CenturyLink and Comtech should have been checking each other, verifying that the entire network was designed and built to meet both

---

[14] Comtech noted that most discussions with CenturyLink and WMD regarding IP and SS7 connections occurred in in-person and unrecorded meetings in early 2017. CenturyLink does not dispute this fact.

companies' 99.999 percent availability requirement. Both should have been intimately involved in the design and provisioning of the entire interconnect. CenturyLink was responsible for 'network' and 'transport,' and they were responsible for the entire network, and all of the circuits, including the part that failed in December 2018.

CenturyLink employee Carl Klein, who served as a subject matter expert during the transition period, testified to a February 2017 meeting between CenturyLink, Comtech, WMD, and Intrado, where he recalled being "surprised at the high volume of questions Comtech posed to CenturyLink, in a sense asking CenturyLink how Comtech should build the 911 network." Klein testified:

> I advised our team to be careful to avoid instructing Comtech how to design its network. I felt like Comtech would potentially attempt to blame CenturyLink should Comtech experience problems when it started to receive calls on its Washington 911 network. Regarding the type of signaling to be used to support the 911 calling (i.e., SS7 vs IP), the parties did not discuss details. The parties had high level discussions, and ended the discussions by agreeing that Intrado and Comtech would continue to discuss the details after the meeting.

Even though Klein believed Comtech did not have a good plan, he advised his team not to tell Comtech how to build its network.

CenturyLink claims it did not know that the ordered circuits were for Comtech's ESInet II network and that Comtech did not otherwise specify that it needed diverse circuits in its orders. Expert Rosen agreed, testifying that "the evidence doesn't show that CenturyLink knew anything about [the nondiverse circuits]." But the Commission also heard testimony about how CenturyLink had reason to know that the replacement SS7 circuits that TNS ordered on behalf of Comtech were for Washington's 911 network. Rosen testified as to why CenturyLink should have known that Comtech's SS7

circuits were on nondiverse networks[15] and that both CenturyLink and Comtech should have been auditing the diversity of the 911 network's circuits. The Commission heard additional evidence to this effect.

Martin Valence, CenturyLink's vice president of network operations, testified that "CenturyLink had capacity on different networks that would have allowed CenturyLink to provision signaling circuits to Comtech over unique networks for completion of 911 calls in the state of Washington." Valence stated, "CenturyLink could have provided Comtech with supplier diversity by itself (by provisioning circuits for SS7 from different networks)." Valence testified that, including the Green Network, CenturyLink has six separate stand-alone optical networks that geographically overlap, which allows CenturyLink to create supplier diversity within its own family of companies. CenturyLink's multiple optical networks show that it does not rely on a single vendor; "even if one optical network fails, the other networks should ensure that calls still complete." Valence thus opined that had Comtech informed CenturyLink that they needed diverse circuits for signaling links to support 911 calls, "CenturyLink could have provided Comtech with supplier/network diversity."

Rosen attributed CenturyLink's lack of knowledge regarding the nondiverse circuits to CenturyLink's lack of interest in Comtech's part of the network. Valence opined, "It was hands off for [CenturyLink], and that was a big mistake, in my opinion." When asked if CenturyLink should have been asking Comtech on a daily basis whether it had changed their circuits, Rosen responded, "No, but you probably would have had some agreement that said if any changes were made, let me know." Rosen testified that

---

[15] CenturyLink concedes that "[n]etwork and carrier diversity are critical elements of a modern 911 network design."

CenturyLink was instead "completely unaware of … [Comtech's] part of the network."

Rosen continued:

> They never asked or their record doesn't show them asking any questions about it. And—and I think that that was wrong. They should have known. And sure, Com[t]ech should have told them, but CenturyLink should have asked. And I don't mean every five minutes ask them if something changed. I don't think that that was reasonable, and that's not what I said.

### B. Commission's Orders

In June 2023 the Commission entered its "Final Order 08." The Commission found that CenturyLink failed in satisfying its statutory obligations to adequately manage and provide 911 telecommunication services. In addition to other violations, the Commission found by a preponderance of evidence that

> … CenturyLink committed at least 13,000 violations of RCW 80.36.080 by failing to render prompt, expeditious, and efficient service; to keep its facilities, instrumentalities, and equipment in good condition and repair; and to ensure that its appliances, instrumentalities, and services are modern, adequate, sufficient, and efficient, resulting in at least 13,000 dropped or incomplete 911 calls.

The Commission imposed a total penalty of more than $1.3 million.[16]

The Commission stated that it continues to recognize that Washington citizens "reasonably rely on their ability to access emergency services by dialing 911." And that "[t]heir inability to do so for even a brief period of time poses a serious threat to public health, safety, and welfare."

The Commission observed that throughout the transition period, CenturyLink retained a contractual obligation to provide reasonably necessary "'services, information, and data … effectuate an orderly and seamless transition'" to Comtech as the "successor provider" to ensure there is no interruption of statewide 911 services.

---

[16] The amount of the penalty is not at issue in this appeal.

The Commission stated that it was not CenturyLink's obligation to ensure that an event such as the packet storm outage never occurred. Additionally, the Commission did not base its decision on any comparison of fault of CenturyLink as compared to Comtech. Rather, the Commission found that both companies were responsible for providing 911 services during the transition period. Thus, "[h]ow they divided that responsibility between themselves," including any agreed upon demarcation point, "did not relieve either of them of their obligation to provide the entirety of the service."

Instead, the Commission identified the issue as whether CenturyLink took reasonable steps to ensure that the state 911 network functioned properly during the transition to Comtech. The Commission concluded that by failing to take reasonable steps to provide acceptable 911 services to Washington customers by preventing or minimizing the disruption of services as a result of a national network outage, CenturyLink violated its statutory obligations under RCW 80.36.080. The Commission found that the packet storm in CenturyLink's nationwide Green Network resulted in more than 13,000 failed calls because CenturyLink did not take reasonable steps to prevent or minimize the disruption of service that followed the packet storm event and thus to ensure that the state 911 "network developed during the transition would function properly."

The Commission reasoned that because CenturyLink insisted on using an SS7-based interconnection rather than Comtech's preferred IP interconnection, it was "all the more incumbent on CenturyLink to make sure that the interconnection was constructed and configured properly. CenturyLink failed to do so." In support of its determination, the Commission found:

14

> Indeed, CenturyLink witness Klein testified during the hearing that CenturyLink deliberately made no attempt to tell Comtech how to build its network, even though it believed Comtech did not have a good plan and despite CenturyLink's long experience with building its own network.
> ….
> The personnel involved in the transition coordination between the companies should have known, or at least inquired about, how Comtech was setting up its network, including the extent to which Comtech was using sufficiently diverse circuits. CenturyLink's refusal or failure to do so was not reasonable and resulted in violations of the Company's legal obligations.

(Emphasis added.)[17]

CenturyLink and Public Counsel independently petitioned for reconsideration.[18]

CenturyLink argued that the evidence demonstrated that CenturyLink made all reasonable efforts to comply with its 911 service obligations and the outage was due to Comtech's unilateral failure to maintain network diversity. Both the Staff and Public Counsel filed oppositions to CenturyLink's petition.

In November 2023 the Commission denied both petitions for reconsideration in its Order 10. The Commission stated:

> Neither petition for reconsideration convinces us that any of the findings and conclusions in Order 08 were erroneous. 911 is the most critically important service a telecommunications company can provide. Lives literally depend on the ubiquitous ability of callers to access first responders, police, and medical personnel in the event of an emergency. Accordingly, we are particularly demanding when reviewing the

---

[17] Not at issue in this appeal, the Commission also concluded that CenturyLink violated WAC 480-120-412 based on its failure to notify all PSAPs and the Commission of the outage. The Commission, however, did not find that CenturyLink violated RCW 80.36.220 or WAC 480-120-450:

> There is no evidence in the record, however, that CenturyLink originated or terminated any of the failed 911 calls and thus the Company did not fail or refuse to receive, exchange, or transmit messages with another carrier within the meaning of RCW 80.36.220. Nor was CenturyLink acting as a local exchange carrier [for 911 services] … at issue here and thus did not violate WAC 480-120-450 when calls failed during the outage.

[18] Public Counsel claimed the Commission inadequately considered CenturyLink's revenues in its penalty amount determination.

<u>reasonableness</u> of the actions CenturyLink took or did not take to comply with the statutes and rules that govern the provision of that service.

(Emphasis added.)

The Commission stated that both CenturyLink and Comtech are to blame for the December 2018 outage. The Commission reasoned that both companies were providing services and responsible for the 911 network and call completion at the time of the outage. "Both companies were required to work together and take reasonable steps to ensure that no outages would occur. They failed." The Commission explained:

> Further, CenturyLink cannot escape its share of liability for that failure by claiming that it did not know Comtech had altered its network to totally rely on circuits from CenturyLink. CenturyLink insisted on the type of network the companies would use yet refused to take a <u>sufficiently active role</u> in designing the resulting network or implementing that design. We agree with the testimony of Brian Rosen that as part of their ongoing meetings, "[b]oth CenturyLink and Comtech <u>should have been checking each other</u>, verifying that the entire network was designed and built to meet both companies' 99.999 percent availability requirement." <u>It was not reasonable for CenturyLink not to have done so</u>, and thus CenturyLink violated RCW 80.36.080 and WAC 480-120-412.

(Emphasis added.)

In its Order 10, the Commission clarified that its conclusion was in regard to CenturyLink's violation of RCW 80.36.080, not its contractual obligations to WMD. "CenturyLink's justifications for its contract performance are thus irrelevant to the liability assessment in Order 08." "Regardless of whether CenturyLink fulfilled its contractual obligations to WMD, Order 08 concluded that … [CenturyLink] violated RCW 80.36.080 …, which the Commission has the authority to enforce." The Commission continued, "CenturyLink was obligated to proactively work with Comtech to ensure the diversity of the 911 network, not simply wait for Comtech to provide information and ask for assistance."

In April 2024 CenturyLink, the Commission, and WMD jointly filed a motion with Thurston County Superior Court to certify this matter for direct appellate review of the Commission's final Orders 08 and 10. The superior court granted the motion and transferred the case without considering its merits to Division Two of this court under RCW 34.05.518.[19] Our sister division transferred the case to Division One.

## DISCUSSION

## Standard of Review

A court's review of the Commission's orders is governed by the Administrative Procedure Act (APA), according to standards set forth in RCW 34.05.570. US W. Commc'ns, Inc. v. Wash. Utils. & Transp. Comm'n, 134 Wn.2d 48, 55-56, 949 P.2d 1321 (1997) (US W. Commc'ns I); US W. Commc'ns, Inc. v. Wash. Utils. & Transp. Comm'n, 134 Wn.2d 74, 85, 949 P.2d 1337 (1997) (US W. Commc'ns II). Subsection (3) of RCW 34.05.570 provides that, among other grounds, the court may grant relief from the Commission's order where:

(d) The agency has erroneously interpreted or applied the law;
(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court … ;
….
or
(i) The order is arbitrary or capricious.

"[T]he burden of proof is upon the appellants to demonstrate that those findings and conclusions are unlawful, unsupported by the evidence, arbitrary or capricious." Cole v. Wash. Utils. & Transp. Comm'n, 79 Wn.2d 302, 309, 485 P.2d 71 (1971); see RCW

---

[19] Under RCW 34.05.518, an administrative agency's final decision in an adjudicative proceeding may be directly reviewed by the court of appeals upon the superior court's certification. RCW 34.05.518(1)(a). The statute has been amended since the superior court's order, but the relevant language has not changed. Compare LAWS OF 2024, ch. 347, § 1 with LAWS OF 202, ch. 305, § 2.

34.05.570(1)(a). Relief is only granted if the requesting party has been substantially prejudiced by the agency's action. RCW 34.05.570(1)(d).

Generally, this court reviews an agency's legal conclusions de novo. Waste Mgmt. of Wash., Inc. v. Wash. Utils. & Transp. Comm'n, 24 Wn. App. 2d 338, 344, 519 P.3d 963 (2022). However, a court should give deference "to an agency's interpretation of the law where the agency has special expertise in dealing with such issues." Schofield v. Spokane County, 96 Wn. App. 581, 587, 980 P.2d 277 (1999). An agency derives its powers from statute. In re Elec. Lightwave, Inc., 123 Wn.2d 530, 536, 869 P.2d 1045 (1994). Thus, although the Commission may not determine the scope of its own authority, a court otherwise generally affords substantial deference to the Commission's decisions. US W. Commc'ns I, 134 Wn.2d at 56; see Postema v. Pollution Control Hr'gs Bd., 142 Wn.2d 68, 77, 11 P.3d 726 (2000) ("[A]n agency's view of the statute will not be accorded deference if it conflicts with the statute."); Elec. Lightwave, 123 Wn.2d at 538 (addressing the Commission's scope of authority and holding that the legislature must expressly grant the Commission the authority to grant monopolies). Where the statute is ambiguous and within the field of the Commission's expertise, this court affords significant deference to the Commission's determination.[20]

---

[20] In its opening brief, CenturyLink cites to the U.S. Supreme Court's holding in Loper Bright Enterprises v. Raimondo, which overturned the federal Chevron doctrine and held that courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority and need not defer to an agency's interpretation of a statute even where it is ambiguous. 603 U.S. 369, 412-13, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024) (overruling Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)). The U.S. Supreme Court's opinion applies to administrative proceedings under the federal Administrative Procedures Act, 5 U.S.C. § 551 et seq., not the Washington APA, which is applicable here. See ch. 34.05 RCW. Only "[w]here there is no Washington case law construing provisions of the Washington APA, federal precedent may serve as persuasive authority." King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 138 Wn.2d 161, 179, 979 P.2d 374 (1999); see Kenmore MHP LLC v. City of Kenmore, 1 Wn.3d 513, 519-21, 528 P.3d 815 (2023) (outlining general legal principles pertinent to the Washington

US W. Commc'ns II, 134 Wn.2d at 86. "Ultimately, it is for the court to determine the meaning and purpose of a statute." Postema, 142 Wn.2d at 77.

A court reviews an agency's decision for a clear showing of abuse of discretion. PacifiCorp v. Wash. Utils. & Transp. Comm'n, 194 Wn. App. 571, 588, 376 P.3d 389 (2016). Under RCW 80.04.430,

> [w]henever the commission has issued or promulgated any order or rule, in any writ of review brought by a public service company to determine the reasonableness of such order or rule, the findings of fact made by the commission shall be prima facie correct, and the burden shall be upon said public service company to establish the order or rule to be unreasonable or unlawful.

(Emphasis added.) The deference that we owe the Commission's findings of fact and conclusions of law is only underscored when the issues involve complex factual determinations that are particularly within the Commission's expertise. Cole, 79 Wn.2d at 309.

This court reviews the Commission's factual findings for substantial evidence. US W. Commc'ns II, 134 Wn.2d at 86. "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premises.'" Elec. Lightwave, 123 Wn.2d at 543-44 (quoting Olmstead v. Dep't of Health, Med. Section, 61 Wn. App. 888, 893, 812 P.2d 527 (1991)). The Commission's unchallenged findings are verities on appeal. PacifiCorp, 194 Wn. App. at 587.

---

APA, including that "an agency's interpretation of ambiguous regulatory language [is upheld] as long as the agency's interpretation is plausible and consistent with the legislative intent").

## The Commission's Authority

### A. RCW 80.36.080

CenturyLink first argues that the Commission's finding that CenturyLink violated RCW 80.36.080 is not grounded in the plain language of the statute or its legislative intent. Specifically, CenturyLink argues that the statute does not support that CenturyLink had an ongoing duty to monitor Comtech to prevent Comtech's unilateral modification of Comtech's side of Washington's 911 telecommunications network. To require such a duty, CenturyLink asserts, would be to impermissibly impose strict liability on CenturyLink merely based on the network's failure. Because CenturyLink mischaracterizes the basis of the Commission's determination and findings, we conclude that CenturyLink has not carried its burden to establish the Commission abused its discretion in its determination of CenturyLink's statutory noncompliance with RCW 80.36.080.

The Commission is authorized to regulate telecommunications services for the public interest. US W. Commc'ns I, 134 Wn.2d at 54 (citing former RCW 80.01.040(3) (1985)); Elec. Lightwave, 123 Wn.2d 530, 534, 869 P.2d 1045 (1994); RCW 80.01.040(3);[21] see RCW 80.36.140.

Under RCW 80.36.080,

> All rates, tolls, contracts and charges, rules and regulations of telecommunications companies, for messages, conversations, services rendered and equipment and facilities supplied, whether such message, conversation or service to be performed be over one company or line or over or by two or more companies or lines, shall be fair, just, reasonable and sufficient, and the service so to be rendered any person, firm or

---

[21] "The utilities and transportation commission shall … [r]egulate in the public interest, as provided by the public service laws, the rates, services, facilities, and practices of all persons engaging within this state in the business of supplying any utility service or commodity to the public for compensation." RCW 80.01.040(3).

> corporation by any telecommunications company shall be rendered and performed <u>in a prompt, expeditious and efficient manner</u> and the facilities, instrumentalities and equipment furnished by it shall be safe, kept in <u>good condition and repair</u>, and its appliances, instrumentalities and service shall be <u>modern, adequate, sufficient and efficient</u>.

(Emphasis added.)

This court gives substantial deference to the Commission's judgment "'about how best to serve the public interest'" as a regulatory agency. <u>PacifiCorp</u>, 194 Wn. App. at 588 (quoting <u>Att'y Gen.'s Off. v. Wash. Utils. & Transp. Comm'n</u>, 128 Wn. App. 818, 824, 116 P.3d 1064 (2005)). To this end, the Commission is authorized to respond to allegations of unreasonable services. <u>See</u> RCW 80.36.140;[22] <u>US W. Commc'ns</u> II, 134 Wn.2d at 117-19 (describing Commission's broad authority to respond to allegations of unreasonably poor service by a telecommunications company); <u>see also</u> WAC 480-120-412(1) ("All companies must make reasonable provisions to minimize the effects of major outages, including those caused by force majeure, and inform and train pertinent employees to prevent or minimize interruption or impairment of service.").

Here, the Commission determined that CenturyLink did not take reasonable steps to protect against an outage in 911 telecommunications services. Indeed, CenturyLink seems to concede that it was required to take reasonable steps to meet its

---

[22] RCW 80.36.140 states in part:
> Whenever the commission shall find, after such hearing that the rules, regulations or practices of any telecommunications company are unjust or unreasonable, or that the equipment, facilities or service of any telecommunications company is inadequate, inefficient, improper or insufficient, the commission shall determine the just, reasonable, proper, adequate and efficient rules, regulations, practices, equipment, facilities and service to be thereafter installed, observed and used, and fix the same by order or rule as provided in this title.

21

obligations as a telecommunications provider under RCW 80.36.080.[23] CenturyLink argues that the Commission inappropriately extended CenturyLink's statutory responsibility to another telecommunications provider's network. Based on the express language of the Commission's orders, this argument is untenable.

In its Orders 8 and 10, the Commission stated that its determination of CenturyLink's violation was in respect to its underlying statutory obligations under RCW 80.36.080 to act reasonably as a joint telecommunications provider of the state's 911 network during the transition period, not its otherwise supplementary allocation of duties as evidenced by contractual agreements with Comtech and WMD. See RCW 80.36.140 (identifying the Commission's authority to order remedies upon finding a statutory violation by "any telecommunications company"). The Commission explained that any division of responsibility between Comtech and CenturyLink did not relieve them of their statutory obligation to take reasonable steps to ensure that the jointly-administered state 911 network functioned properly. The Commission instead stated that both CenturyLink and Comtech failed in their statutory responsibility to take reasonable steps to ensure no service outage would occur.

CenturyLink does not contest the Commission's finding that at the time of the outage CenturyLink and Comtech were contracted to provide state 911

---

[23] Because CenturyLink does not challenge the Commission's application of a standard of reasonableness in regard to a telecommunications company's performance under RCW 80.36.080, the cases that it cites to argue that CenturyLink exceeded its regulatory scope are inapposite. See Crosswhite v. Dep't of Soc. & Health Servs., 197 Wn. App. 539, 557, 389 P.3d 731 (2017) (discussing the State's purported expansion of the legal definition of "abuse" as an improper broadening of its punitive authority); City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 136 Wn.2d 38, 46, 58, 959 P.2d 1091 (1998) (rejecting regulatory agency's definition of agricultural land as not supported by statute); Karanjah v. Dep't of Soc. & Health Servs., 199 Wn. App. 903, 914-16, 924, 401 P.3d 391 (2017) (holding that agency misinterpreted law by holding nursing assistant to a higher standard).

telecommunications services or that the two companies were providing services in a jointly-created network. CenturyLink does not dispute that it is a "telecommunications company," or public utilities company, otherwise subject to the Commission's broad regulatory authority. See US W. Commc'ns II, 134 Wn.2d at 96 ("The Commission has broad authority to regulate the practices of public utilities."). As such, while CenturyLink's purported compliance with the terms of its contractual agreements with Comtech and WMD may be evidence of the reasonableness of its conduct, it does not categorically resolve the issue of whether CenturyLink fulfilled its shared statutory responsibility with Comtech under RCW 80.36.080 to provide "modern, adequate, sufficient and efficient" statewide 911 services as a joint telecommunications provider. Thus, because the Commission examined whether CenturyLink acted reasonably to satisfy its statutory obligation as a telecommunications provider for the entire statewide 911 network, it cannot be said that CenturyLink was held strictly liable for its failure.

CenturyLink asserts that the legislature intended for the Commission's broad regulatory authority over telecommunications services to be exercised in exchange for a telecommunications company's "de facto monopoly over [telecommunications] services offered in the state." Such ostensible intent, CenturyLink avers, undermines the Commission's imposition of an implied duty to monitor another carrier's network on CenturyLink and penalize it for Comtech's failure to maintain diversity within its ESInet II network. We disagree.

CenturyLink's sole cited authority is not well-taken. CenturyLink refers to this court's decision in Wash. Indep. Tel. Ass'n v. Telecomms. Ratepayers Ass'n for Cost-Based & Equitable Rates, 75 Wn. App. 356, 366-67, 369, 880 P.2d 50 (1994), wherein

we referenced the legislature's intent in regard to the Commission's rate-making authority. In Wash. Indep. Tel. Ass'n, we discussed the state Supreme Court's analysis in Jewell v. Wash. Utils. & Transp. Comm'n, 90 Wn.2d 775, 777-78, 585 P.2d 1167 (1978). 75 Wn. App. at 366-67. In Jewell, the court held that in return for a monopoly, telephone companies "are regulated extensively by the commission, including most importantly the rate structure which they may charge their customers." 90 Wn.2d at 776. "The public interest, in return for the grant of a monopoly, requires prompt, expeditious and efficient service. Quid pro quo, the company is entitled to rates which are fair, just, reasonable and sufficient to allow it to render such services." Id. at 777 (emphasis added). The court held that the telephone company's increased rate charges to cover its charitable contributions did not translate to service users "receiving any more prompt or expeditious service." Wash. Indep. Tel. Ass'n, 75 Wn. App. at 366 (discussing Jewell, 90 Wn.2d at 777). The court observed that the telephone company's monopolistic control over state services meant that increased service charges to cover its charitable contributions required customers to make involuntary contributions. Jewell, 90 Wn.2d at 777-78.

Thus, CenturyLink's proffered authority shows the significance of a monopoly in the public utility context is in regard to service users' dependence on the service provider for efficient and adequate services. See Wash. Indep. Tel. Ass'n, 75 Wn. App. at 366 (discussing Jewell, 90 Wn.2d at 777-78). This dependence justifies the Commission's expansive regulatory powers in the name of public interest. See id.; Tanner Elec. Co-op. v. Puget Sound Power & Light Co., 128 Wn.2d 656, 684, 911 P.2d 1301 (1996) ("The regulation of public utilities by a state agency replaces competition

24

and ensures that the public interest is protected."). Indeed, although the Commission is required under RCW 80.36.320 to "classify a telecommunications company as a competitive telecommunications company" subject to minimal regulation if "customers have reasonably available alternatives and … the company does not have a significant captive customer base," the Commission does not have authority to grant monopolies or exclusive rights to telecommunications companies. Elec. Lightwave, 123 Wn.2d at 537-38, 542 (discussing RCW 80.36.230); see RCW 80.36.300(2), (5) (stating legislative policies to maintain efficient telecommunications service and promote diversity in telecommunications services supply).

Here, there is no question that 911 callers depended on the state 911 telecommunications system that was jointly administered by CenturyLink and Comtech when the December 2018 outage occurred. CenturyLink does not dispute the Commission's finding that "[t]he citizens of this state reasonably rely on their ability to access emergency services by dialing 911. Their inability to do so for even a brief period of time poses a serious threat to public health, safety, and welfare not just a violation of statute and Commission rules."

CenturyLink argues that the Commission erred by holding it liable for a problem with another telecommunication company's separate network, rather than its own. However, because CenturyLink had a shared responsibility with Comtech to provide statewide 911 telecommunications services, CenturyLink's attempt to divide responsibility based on network territories is unpersuasive. Indeed, CenturyLink conceded at oral argument that CenturyLink and Comtech were in a transition period at the time of the outage and that, to effectuate the state's 911 system, calls required

"handoffs" between the two companies. Wash. Ct. of Appeals oral arg., supra, at 2 min. 04 sec. through 3 min. 48 sec.

In the instant matter, the issue of the applicability of the Commission's statutory authority is simply whether CenturyLink was a provider of the state 911 telecommunications network that failed in December 2018. See RCW 80.36.080, .140; RCW 80.01.040(3), (4). It is undisputed that at the time of the outage CenturyLink and Comtech were joint providers of the state 911 telecommunications system. Further, the record shows that at the time of the outage CenturyLink was involved in each call, including determining which calls were directed to Comtech's PSAPs.

We conclude that CenturyLink has not carried its burden to show that the Commission exceeded its scope of authority by finding that CenturyLink had a shared statutory responsibility with co-provider Comtech to deliver "modern, adequate, sufficient and efficient" services under RCW 80.36.080 by making reasonable efforts to ensure that the state's 911 network functioned properly throughout the transition period between the two companies.

B. Due Process

A regulation "'is unconstitutional when it forbids conduct in terms so vague that persons of common intelligence must guess at its meaning and differ as to its application.'" Postema, 142 Wn.2d at 114 (quoting Burien Bark Supply v. King County, 106 Wn.2d 868, 871, 725 P.2d 994 (1986)). Such a regulation violates due process by not providing fair warning. Id. "The doctrine serves two important goals – providing fair notice as to what conduct is proscribed, and protection against arbitrary enforcement of the laws." Id. CenturyLink argues that the Commission's determination violated its due

process right by imposing an unsupported duty to periodically monitor a co-provider's activity to ensure its contractual compliance. We disagree.

CenturyLink again mischaracterizes the basis of the Commission's determination. The Commission did not reinterpret RCW 80.36.080 to find that CenturyLink violated a responsibility to monitor another provider. Rather, the Commission found that, like Comtech, CenturyLink had a responsibility "to make reasonable efforts to prevent or minimize the disruption of service if such an event [as a nationwide network] occurs."

A telecommunications company is required under RCW 80.36.080 to provide services that are "prompt, expeditious and efficient" and "modern, adequate, [and] sufficient." These terms are not defined. "When a statute is ambiguous and when the statute is within the field of expertise of the Commission," we give significant deference to the Commission's determination. US W. Commc'ns II, 134 Wn.2d at 86. As stated above, CenturyLink does not challenge that it had a statutory responsibility to act reasonably in its provision of services. Additionally, CenturyLink expressly agreed in its contract with WMD to "provide … all services, information and data reasonably necessary to effectuate an orderly and seamless transition [to a successor provider] … and to ensure that there is no interruption of 9-1-1 [telecommunications] service in the State of Washington." This responsibility existed throughout the transition period during which both CenturyLink and Comtech were jointly contracted to administer the state 911 telecommunications system. To support its conclusion that CenturyLink acted unreasonably to violate RCW 80.36.080, the Commission cited evidence that supported its conclusion that CenturyLink "should have known, or at least inquired about" how

27

Comtech was setting up its network, including its use of sufficiently diverse circuits, in order to prevent an interruption in state 911 telecommunications services. Because the Commission has special expertise in the area of telecommunications service regulation, we defer to its interpretation of what conduct constitutes a violation of RCW 80.36.080. See Cole, 79 Wn.2d at 309. CenturyLink's due process claim fails.

### Substantial Evidence

We review the factual question of whether CenturyLink did not take reasonable steps to satisfy its statutory responsibility for substantial evidence. CenturyLink argues the Commission's factual finding that CenturyLink was required to monitor Comtech's network after its initial design is not supported by substantial evidence. However, in an attempt to distinguish its conduct during the initial implementation of the joint 911 network from its conduct thereafter, CenturyLink overlooks the totality of the Commission's finding and its evidentiary support. Because the record adequately supports the Commission's relevant finding, we conclude that CenturyLink has not met its burden to overcome the presumption of the validity of the Commission's factual findings. See RCW 80.04.430.

Under RCW 34.05.461(3), the Commission's final orders must "include a statement of findings and conclusions, and the reasons and basis therefor, on all the material issues of fact, law, or discretion presented on the record." An administrative agency's factual findings are supported by substantial evidence when there is sufficient evidence to persuade a fair-minded person. PacifiCorp, 194 Wn. App. at 586. This court reviews the record as a whole for substantial evidence. Callecod v. Wash. State Patrol, 84 Wn. App. 663, 670, 929 P.2d 510 (1997).

The substantial evidence standard is "'highly deferential.'" <u>PacifiCorp</u>, 194 Wn. App. at 586 (quoting <u>ARCO Products Co. v. Wash. Utils. & Transp. Comm'n</u>, 125 Wn.2d 805, 812-13, 888 P.2d 728 (1995)). This court views "the evidence and any reasonable inferences in the light most favorable to the party that prevailed in the highest forum exercising fact finding authority." <u>Schofield</u>, 96 Wn. App. at 586. As long as substantial evidence supports the Commission's finding, it is immaterial that other evidence may contradict it. <u>PacifiCorp</u>, 194 Wn. App. at 598. This court defers to the Commission's weighing of evidence, including its assessment of witness credibility. <u>Id.</u> at 588. "Similarly, the Commission is afforded broad discretion in weighing the testimony of experts." <u>Id.</u> at 588-89 (citing <u>US W. Commc'ns</u> I, 134 Wn.2d at 62).

Here, the Commission identified the issue under RCW 80.36.080 as being "whether CenturyLink took reasonable steps to ensure that the [Washington 911] network developed during the transition [between CenturyLink to Comtech] would function properly." The Commission found that "CenturyLink insisted on using an SS7-based interconnection of its network with Comtech's rather than the IP interconnection Comtech preferred. It was thus all the more incumbent on CenturyLink to make sure that the interconnection was constructed and configured properly. CenturyLink failed to do so."

The Commission concluded that CenturyLink violated RCW 80.36.080 because it did not "make reasonable efforts" to provide acceptable 911 telecommunications services in Washington. It is apparent from the Commission's Order 08 that the Commission made such a determination based on the finding that CenturyLink "personnel involved in the transition coordination between the companies should have

known, or at least inquired about, how Comtech was setting up its network, including the extent to which Comtech was using sufficiently diverse circuits." The Commission continued by stating that "CenturyLink's refusal or failure to do so was <u>not reasonable</u> and resulted in violations of the Company's legal obligations." (Emphasis added.)

In its denial of petitions for reconsideration, the Commission specifically clarified in Order 10 that CenturyLink could not escape statutory liability by claiming it did not know that Comtech made a unilateral decision to rely on non-diverse SS7 circuits. The Commission stated that, although Comtech is also to blame, the companies "were required to work together and take reasonable steps to ensure that no outages would occur." The Commission found that "CenturyLink insisted on the type of network the companies would use yet [unreasonably] refused to take a sufficiently active role in designing the resulting network or implementing that design."

The Commission stated, "As discussed … in Order 08, CenturyLink was obligated to proactively work with Comtech to ensure the diversity of the 911 network, not simply wait for Comtech to provide information and ask for assistance." The Commission stated that it agreed with Rosen's testimony that "as part of their ongoing meetings, '[b]oth CenturyLink and Comtech should have been checking each other, verifying that the entire network was designed and built to meet both companies' 99.999 percent availability requirement.'[24] It was not reasonable for CenturyLink not to have done so, and thus CenturyLink violated RCW 80.36.080."

---

[24] Earlier in his testimony, Rosen opined that "[h]ighly available systems [like 911 systems] are supposed to be immune to failures that impact the entire system."

CenturyLink first argues in its opening brief that it is unclear whether Rosen's testimony is regarding CenturyLink's responsibility in respect to the network's initial design or "Comtech's unilateral changes to the design, or both."

However, in the context of his testimony regarding the heightened complexity of the SS7-based system, Rosen testified that both CenturyLink and Comtech "should have been intimately involved in the design and the provisioning of the entire interconnect." (Emphasis added.) Contrary to CenturyLink's assertion that it was not clear whether Rosen was referring to the original network design or future changes to the network, Rosen testified that "CenturyLink was responsible for 'network' and 'transport,' and they were responsible for the entire network, and all of the circuits, including the part that failed in December 2018." Emphasis added.

Second, CenturyLink challenges the Commission's finding that CenturyLink insisted on using an SS7-based interconnection between its ESInet I network and Comtech's ESInet II network. Although CenturyLink concedes in its reply brief that it originally proposed an SS7-based system for the 911 network, it cites to a subsequent email wherein CenturyLink offered an alternative IP interconnection option that Comtech rejected. Based on the citations to the record in CenturyLink's reply brief, the record shows that Comtech declined this later offered option for logistical reasons. Moreover, CenturyLink does not argue that it offered Comtech the same IP-based solution that Comtech initially requested. CenturyLink also seems to concede that, regardless of its later offer of an IP-based alternative, CenturyLink still preferred an SS7-based system.[25]

---

[25] CenturyLink notes in its reply brief, "While CenturyLink originally proposed using SS7, it went back to Comtech with an IP solution, and Comtech rejected it opting for SS7 instead." In support, CenturyLink cites to a "Comtech email to CenturyLink stating: 'our recommendation at this time is to pursue ESInet to ESInet connections … using standard ISUP/TDM. … Our

Further, CenturyLink does not address Comtech's statements in the record that CenturyLink repeatedly refused to use a direct IP interconnection in meetings between the two companies in early 2017, many of which were not recorded. "The possibility of drawing inconsistent conclusions from the evidence does not prevent an administrative agency's findings of fact from being supported by substantial evidence." Ostrom Mushroom Farm Co. v. Dep't of Lab. & Indus., 13 Wn. App. 2d 262, 271-72, 463 P.3d 149 (2020); see also Schofield, 96 Wn. App. at 586 (stating the reviewing court views the evidence and any reasonable inferences most favorably toward the prevailing party).[26]

Third, CenturyLink argues that it is unjust for the Commission to penalize CenturyLink for the use of an SS7-based system when it was contemplated in its SOW agreed to by WMD (as well as Comtech). However, the Commission did not find that CenturyLink violated RCW 80.36.080 based on the mere use of an SS7-based system. Instead, the Commission found that because the two companies used a system that was chosen by CenturyLink, CenturyLink was obligated to take an active role to make sure that the network was constructed and functioning properly throughout the transition period.

Rosen testified that the use of the SS7-based system, which he characterized as "older technology," increased the risk of the outage. Rosen testified to the technical

---

second preference is to use Basic SIP as described in the West NNI document.' … ISUP messages are those sent in SS7 signaling."

[26] For this same reason, CenturyLink's suggestion in its reply brief that the lack of "a provision in[] the SOW requiring CenturyLink to periodically check in with Comtech" does not defeat the conflicting evidence in the record that supports the Commissions' finding that CenturyLink should have been proactive in its collaboration with Comtech to ensure the ongoing functionality of the state 911 telecommunications system.

complexity of the SS7-based system, including the system requiring calls to be converted between SS7 and IP at least three times as they moved through the system. Rosen opined that adding another entity, such as TNS, increased the probability of the network's failure and "greatly increased the complexity of the interconnect." Rosen opined that, in addition to the lack of diverse SS7 circuits, the "system failure occurred because CenturyLink insisted on using an SS7-based system to interconnect with Comtech."

Rather than taking a proactive stance with Comtech with regard to the ongoing operation of Washington's 911 system, Rosen testified that CenturyLink "had no interest in [Comtech's] part of the network" and took a "hands off" approach, which "was a big mistake." Rosen opined, "[S]ure, Comtech should have told [CenturyLink about the change to nondiverse circuits], but CenturyLink should have asked," and "[t]hey never asked." Rosen opined that CenturyLink and Comtech should have been auditing the diversity of the 911 network's circuits.

Multiple experts, including Rosen, opined that CenturyLink should have known about the lack of diversity. Rosen's testimony spoke to a collaborative standard that CenturyLink should have exercised in its joint provider relationship with Comtech.

In its reply brief, CenturyLink argues this court should not consider the State's argument that CenturyLink had a duty to audit the network because the Commission made no such finding. However, this court is not limited in its review of the record in regard to the issue of whether substantial evidence supports the Commission's finding that CenturyLink acted unreasonably pursuant to its statutory obligations under RCW 80.36.080. See RCW 34.05.570(3)(e); see also Whitehall v. Wash. State Emp. Sec.

Dep't, 25 Wn. App. 2d 412, 420, 523 P.3d 835 (2023) ("'When a party contends an agency decision is not supported by substantial evidence, we review the entire agency record.'") (quoting Affordable Cabs, Inc. v. Emp't Sec. Dep't, 124 Wn. App. 361, 367, 101 P.3d 440 (2004)). The Commission heard additional testimony to this effect.

Regardless, CenturyLink's complaint that the evidentiary support for the Commission's order is limited to Rosen's sparse testimony is not well-taken. This court should not substitute its judgment for the Commission's with regard to the weight granted to witnesses, experts, or conflicting evidence. Beatty v. Wash. Fish & Wildlife Comm'n, 185 Wn. App. 426, 449, 341 P.3d 291 (2015); Att'y Gen.'s Off., Pub. Couns. Unit v. Wash. Utils. & Transp. Comm'n, 4 Wn. App. 2d 657, 682, 423 P.3d 861 (2018). In a complex and technical factual area that is close to the heart of the agency's expertise such as this, the agency's fact-based determinations are given significant deference. Beatty, 185 Wn. App at 449.

Fourth, CenturyLink argues that because Klein testified in regard to the initial development of the transition plan between CenturyLink and Comtech, his testimony does not support that CenturyLink was required to monitor Comtech on an ongoing basis. The Commission's order does not show that Klein's testimony was used for this purpose. Rather, it is apparent that the Commission cited Klein's testimony in support of its conclusion that CenturyLink failed to take reasonable steps to ensure the interconnection between CenturyLink's ESInet I and Comtech's ESInet II networks "was constructed and configured properly" to ensure the proper functioning of the state 911 network throughout the transition period. Indeed, Klein's testimony indicates the company's unreasonable hands-off approach to its joint-provider relationship with

Comtech. Klein testified that at a February 2017 meeting, he was surprised at how many questions Comtech was asking CenturyLink about how to build the 911 network. Klein, as observed in the Commission's Order 08, testified during the hearing that he advised his team not to tell Comtech how to build its network, even though he believed Comtech did not have a good plan. In addition to his testimony cited by the Commission, Klein testified, in the context of the February 2017 meeting, that he was wary of becoming too involved with Comtech's network in the event Comtech tried to blame CenturyLink for future mishaps, and that although the companies "had high level discussions," they did not share details and instead ended "the discussions by agreeing that [third party vendor] Intrado and Comtech would continue to discuss the details after the meeting." Although Klein testified that his role in the transition became more limited after the February 2017 meeting, as CenturyLink alludes to in its briefing, the fact that CenturyLink attempted to distance itself from Comtech's plan during the shared network's initial design supports the Commission's conclusion that CenturyLink unreasonably assumed a passive posture to the companies' joint provision of state 911 services.[27]

Finally, in its Order 08, the Commission acknowledged that Washingtonians "reasonably rely on their ability to access emergency services by dialing 911," and that even a brief interruption in 911 call services "poses a serious threat to public health, safety, and welfare." "[The major outage] in December 2018 was a serious health and safety threat to Washington state residents." In its denial of the petitions for

---

[27] Indeed, Klein testified that "[m]ost of the technical details for transitioning services to Comtech were worked out between Comtech and Intrado, with [CenturyLink employee] supporting those discussions as the company's project manager."

35

reconsideration, Order 10, the Commission again emphasized how the context of 911 telecommunications services factored into its determination. Because "911 is the most critically important service a telecommunications company can provide," the Commission stated it is "particularly demanding when reviewing the reasonableness of the actions CenturyLink took or did not take to comply with the statutes and rules that govern the provision of that service." CenturyLink does not dispute the profound responsibility a telecommunications company assumes when it contracts to provide 911 services. Relevant policy considerations are within the Commission's discretion. U.S. W. Commc'ns II, 134 Wn.2d at 99. Accordingly, and in light of the record before this court, we reject CenturyLink's contention that its liability is not supported by contract, law, or an industry standard.

In consideration of the record and the high level of deference this court owes to an agency's factual findings in a hyper-technical field such as this, see Beatty, 185 Wn. App at 449, the Commission's finding that CenturyLink violated RCW 80.36.080 by assuming an unreasonable hands-off approach to its joint provision of 911 call services is supported by substantial evidence.

Arbitrary and Capricious

*A. Finding of Statutory Violation*

CenturyLink argues that the Commission's determination is arbitrary and capricious. We disagree.

The Commission's action is arbitrary and capricious only if it "'is willful and unreasoning and taken without regard to the attending facts or circumstances.'" PacifiCorp, 194 Wn. App. at 587 (internal quotation marks omitted) (quoting Att'y Gen.'s

Off., 128 Wn. App. at 824). The Commission's determination is not arbitrary and capricious merely because "'there is room for two opinions.'" Id. "'Neither the existence of contradictory evidence nor the possibility of deriving conflicting conclusions from the evidence renders an agency decision arbitrary and capricious.'" Id. "The scope of review under this standard is 'very narrow' and the party seeking to demonstrate that action is arbitrary and capricious 'must carry a heavy burden.'" Karanjah v. Dep't of Soc. & Health Servs., 199 Wn. App. 903, 925, 401 P.3d 381 (2017) (quoting Pierce County Sheriff v. Civ. Serv. Comm'n of Pierce County, 98 Wn.2d 690, 695, 658 P.2d 648 (1983)).

CenturyLink asserts that this court's decision in Karanjah, 199 Wn. App. 903, is instructive. In Karanjah, this court considered whether a nursing aide's conduct toward a resident in an assisted living facility constituted abuse under the law. 199 Wn. App. at 923-24. This court held that the agency's factual findings established that Karanjah's actions were protective and not knowingly injurious or ill-tended as required by statute. Id. at 922-25. Further, this court held that the agency misinterpreted the law as requiring Karanjah to establish she was acting in self-defense or the defense of others to be reasonable. Id. at 924-25. Because the agency's decision was in disregard of facts and circumstances that made Karanjah's actions protective as a matter of law, it was arbitrary and capricious. Id. at 925.

Karanjah is inapposite. In the instant case, the Commission enforced CenturyLink's liability under RCW 80.36.080, which requires a telecommunications provider to furnish services that are "prompt, expeditious and efficient" and "modern, adequate, [and] sufficient." These statutory terms are not defined with specificity like the

definition of abuse was in Karanjah. See 199 Wn. App. at 914. As referenced above, "in the case of an ambiguous statute which falls within the agency's expertise, the agency's interpretation of the statute is accorded great weight, provided it does not conflict with the statute." Utter v. Bldg. Indus. Ass'n of Wash., 182 Wn.2d 398, 421, 341 P.3d 953 (2015); see Glaubach v. Regence Blueshield, 149 Wn.2d 827, 834, 74 P.3d 115 (2003) ("This court … give[s] great weight to the interpretation of statutes laid down by the executive agency charged with enforcement."). CenturyLink does not otherwise challenge the reasonableness standard that the Commission employed to assess its conduct as related to the December 2018 outage under RCW 80.36.080.

CenturyLink again attempts to narrow its scope of liability by arguing that the Commission must have cited an explicit standard for how often CenturyLink should have checked in with Comtech to ensure its conduct was reasonable. Yet, with regard to the factual basis of the Commission's determination, CenturyLink does not argue that it inquired about Comtech's ongoing use of sufficiently diverse circuits to any extent, or that it was otherwise actively collaborating with Comtech to ensure there was no interruption in ongoing state 911 services after the initial network was deployed.[28] Instead, CenturyLink's contention incorrectly implies that whether the Commission can conclude a telecommunications company's conduct is unreasonable is a question of law rather than necessarily involving factual determinations grounded in the Commission's expertise. We give substantial deference to agency views when its "determination is based heavily on factual matters, especially factual matters which are complex,

---

[28] In its reply brief, CenturyLink states that although "[i]t worked with Comtech to jointly develop and test the original network," "what CenturyLink did not do was attempt to micromanage Comtech after the original network was designed, deployed, and tested."

technical, and close to the heart of the agency's expertise." Hillis v. Dep't of Ecology, 131 Wn.2d 373, 396, 932 P.2d 139 (1997). CenturyLink provides no authority to establish that the Commission improperly exercised its discretion in accordance with RCW 80.36.080 as granted by the legislature. See PacifiCorp, 194 Wn. App. at 615 ("In reviewing matters within agency discretion, the court shall limit its function to assuring that the agency has exercised its discretion in accordance with law, and shall not itself undertake to exercise the discretion that the legislature has placed in the agency.") (internal quotation marks omitted) (quoting Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n, 148 Wn.2d 887, 904, 64 P.3d 606 (2003)); RCW 34.05.574(1). As long as the agency considered the circumstances underlying CenturyLink's alleged violation of RCW 80.36.080, we will not conclude that the Commission's determination was arbitrary and capricious merely based on the possibility that another factfinder may have logically found that its conduct was reasonable under the circumstances. See Rosemere Neigh. Ass'n v. Clark County, 170 Wn. App. 859, 872, 290 P.3d 142 (2012) (citing Port of Seattle v. Pollution Control Hr'gs Bd., 151 Wn.2d 568, 589, 90 P.3d 659 (2004)).

As stated above, the Commission properly applied RCW 80.36.080 to CenturyLink as a telecommunications service provider that was jointly responsible for the provision of statewide 911 services. The Commission's factual findings that establish CenturyLink's conduct was unreasonable so as to violate its responsibility as a state telecommunications provider to provide modern, adequate, sufficient, and efficient services are further supported by substantial evidence. Thus, because the

Commission's decision is grounded in both law and the record, we conclude its decision was not arbitrary and capricious.

## B. Cross-Examination of Rosen

Finally, CenturyLink avers that the Commission acted arbitrarily and capriciously when the administrative law judge (ALJ) overseeing the evidentiary hearing purportedly limited the development of CenturyLink's cross-examination of Public Counsel's expert witness Rosen. The record does not factually support CenturyLink's characterization.

At cross CenturyLink's counsel asked Rosen:

> Q.    If you test circuits with supplier diversity and supplier diversity exists, and then Com[t]ech elects to replace two of those circuits from a provider and replace them, shouldn't Com[t]ech – Com[t]ech contact CenturyLink and say we're making this change?
>
> A.    I – in my opinion, yes. In my opinion, CenturyLink should have known. But the evidence doesn't show that CenturyLink knew anything about it. They had no interest in this part of the network. It was hands off for them, and that was a big mistake, in my opinion.
>
> Q.    Okay. But you keep saying CenturyLink should have known?
>
> A.    Yes, they should have known.
>
> Q.    So just wait a second here. So if you're testing a network and supplier diversity exists, two from someone else, two from you, and the other party replaced the circuits that are from someone else, how am I – am I supposed to go and ask CenturyLink? How many days should I ask? Every day? Did you change the circuits today? The next day, did you change the circuits today? Should I be asking this on a daily basis?
>
> A.    No, but you probably would have had some agreement that said if any changes are made, let me know.
>
> Q.    Isn't that something that Com[t]ech, since it was the one making the change and knew of this, should have contacted CenturyLink and told them?
>
> [Public Counsel]: Asked and answered.
>
> [ALJ]: Yes, this is becoming argumentative. So can we move on, [CenturyLink's counsel]?
>
> [CenturyLink's counsel]: Sure, Your Honor.
>
> BY [CenturyLink's counsel]:
>
> Q.    A general question, Mr. Rosen, how often do you think it was –CenturyLink should go back and ask Com[t]ech was there any changes to the network design?

A.    I don't think that they needed to do that. I think Com[t]ech should have told them, but they never asked anything. They didn't—they weren't completely unaware of this part of the network. They did not know anything about it. They never asked or their record doesn't show them asking any questions about it. And—and I think that that was wrong. They should have known. And sure, Com[t]ech should have told them, but CenturyLink should have asked. And I don't mean every five minutes ask them if something changed. I don't think that that was reasonable, and that's not what I said.

CenturyLink then proceeded to refer to an exhibit and posed a hypothetical question to Rosen related to Comtech's communication with CenturyLink about their need for SS7 replacement circuits.

The above exchange that is recited by CenturyLink in its briefing does not indicate that the ALJ's prompt for CenturyLink's counsel to "move on" prevented CenturyLink from substantively developing Rosen's testimony. By the time the ALJ asked Rosen to move on, Rosen had already answered the question as to whether Comtech should have informed CenturyLink about the change to their ESInet II network, "[I]n my opinion, yes." CenturyLink does not explain how the ALJ erred in acknowledging Public Counsel's objection to the repeated question, or how the ALJ's instruction substantively prevented the development of Rosen's testimony. There is no indication in the cited record that CenturyLink challenged, made argument, or otherwise observed a limitation to their ability to advance their cross-examination of Rosen.[29] Thus, there is simply neither developed record nor argument to enable this court to consider CenturyLink's evidentiary contention.[30] See RAP 10.3(a)(6); West v. Thurston County, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012) (stating that this court does not

---

[29] CenturyLink seems to concede this point in their reply brief.

[30] This court otherwise reviews an administrative law judge's evidentiary decision for abuse of discretion. King County Pub. Hosp. Dist. No. 2 v. Dep't of Health, 178 Wn.2d 363, 372, 309 P.3d 416 (2013). An abuse of discretion occurs when the administrative law judge's

consider conclusory or unreasoned arguments).

      We affirm.

_____
Coburn, J.

WE CONCUR:

_____
Chung, J.

_____
Mann, J.

---

decision is manifestly unreasonable, exercised on tenable grounds, or exercised for untenable reasons. McClure & Sons, Inc. v. Dep't of Lab. & Indus., 16 Wn. App. 2d 854, 862, 487 P.3d 186 (2021).